IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

STATE OF NEW MEXICO, *ex rel.*
State Engineer

              Plaintiff,                      CV 69-7941 BB-ACE

      vs.                              RIO CHAMA STREAM SYSTEM
                                      Section 5: Rio Gallina
RAMON ARAGON, *et al.,*

              Defendants.           Subfile Nos. CHGA-004-0003; and
                                    CHGA-004-0004

---

**STATE OF NEW MEXICO'S OBJECTIONS
TO SPECIAL MASTER'S REPORT AND RECOMMENDATIONS
ON DISPUTED SUBFILES**

---

COMES NOW the Plaintiff State of New Mexico and makes the following objections to the

Special Master's Report and Recommendation on Disputed Subfiles (herein after "Special Master's

Report) filed July 23, 2003 (docket 7203) in connection with subfiles CHGA-004-0003 and CHGA-

004-0004.

**I.    BACKGROUND**

The water rights claims of Defendants Abram Cordova and Faye Davis under subfiles CHGA-

004-0003 and CHGA-004-0004 were consolidated for trial beginning January 28, 2003.[1]   The

Defendants' claimed tracts of irrigated lands are located near Gallina, New Mexico along the course

of the Rio Capulin.  Aerial photographs showing the location of the two tracts, and the areas for which

surface water irrigation rights are claimed, are shown in State's Exhibits 4 and 5.  The direction of water

---

[1]      The Special Master heard testimony in connection with these disputed subfiles on
January 28, 29 and 30, 2003.  The transcript of proceedings for this testimony will be cited herein as
Tr. Vol. I, Vol. II and Vol III respectively.

flow in the Rio Capulin in the area where the tracts are located is from east to west.

The tracts for which Defendants Cordova and Davis claim water rights are adjacent to each other, and in terms of their topography and vegetative characteristics the differences between the two tracts are minor. Tr. Vol. I, 179; Vol. II, 13, 149. Significantly, the two tracts are located within the channel of the Rio Capulin itself, an area that has been described variously as the river bed, bottom land, or flood plain of the Rio Capulin. Tr. Vol. I, 172, 175; Vol. II, 156-57. However these tracts are characterized, it is undisputed that they are relatively flat and that they experience regular flooding during the spring run-off period and during the summer months after local rain storms. Tr. Vol. I, 135, 139, 148-49, 178. Although bare spots were present on the tracts during the dry summer of 2002, for the most part the two tracts are covered by a dense layer of natural vegetation. Tr. Vol. II, 155-56; *see also* Defendant's Exhibit 9, pp. 1-2. There are also small areas of standing water in some locations. Tr. Vol. I, 179-82; Vol. II 139. Photographs showing the general appearance of the two tracts in late May 2002 are included in State's Exhibit 3, pp. 22-41. Additional photographs taken in October of 2002 are included in Defendant's Exhibit 10.

The plant community on the two tracts has been classified by the Defendant's expert, William Dunmire, as a Baltic Rush-Redtop Community Type. This is a wetland community type that is typically associated with annual or semiannual flooding. Tr. Vol. II, 147,152-54. The dominant and most abundant vegetation on both tracts is baltic rush (*Juncus balticus*) and redtop grass (*Agrostis gigantea*). Tr. Vol. II, 141-42. In the USDA Plants Database and the U.S. Army Corps of Engineers Region 6 Wetland Plant List, baltic rush is classified as an obligate wetlands species.[2] State's Exhibit 3, pp. 13. In other words, this species occurs almost always (estimated probability 99%) under natural

_____

[2]    The Special Master's report omitted any mention of the presence of this plant species on the two properties. *See* Special Master's Report, Recommended Finding No 13.

-2-

conditions in wetlands.  Redtop has been classified as a facultative wetland or facultative species, and it is equally likely to occur in wetlands or non-wetlands.  *Id.* at 12.  In parts of the Cordova tract where there is standing water, cattails (*Typha*) are growing.  *Id.* at 6.  All three species of the genus *Typha* are classified as obligate wetland species by the U.S. Army Corps of Engineers Region 6 Wetland Plant List and the USDA Plants Database.  *Id.* at 15.  The Defendant's expert characterized the area as "bottomland swale" intending to indicate "that there was high vegetation, and that it was more of dryer, kind of marshy [wet] than permanently wet. . . . It is a wetland, but I would say it's on the dryer side of the range of wetlands" Vol. II, Tr. 151-52.

A number of factors may be contributing to the observed wetland conditions on the two tracts: annual or frequent flooding; clay soils, poor soil drainage, localized aquifers perched upon clay layers within the alluvium of the river; and finally, discharge from an artesian aquifer in the Poleo Sandstone unit into the river alluvium below where the two tracts are located.  Tr. Vol. II, 44-45.  All of these factors could be operating simultaneously.  *Id.*

There are several physical features located on the Davis tract that were the subject of considerable testimony during the disputed subfile hearings.  Beginning about midway along the southern boundary of the Davis tract (subfile CHGA-004-003) there is a channel or trench running diagonally to the northwest.  This channel is clearly visible in the aerial photograph of the property in State's Exhibit 4.  The channel ends at a point of diversion (marked by a large blue dot on the subfile map) for a ditch labeled Unnamed Ditch No. 1.  Tr. Vol. I, 176.  This ditch (Unnamed Ditch No. 1) leads to irrigated land about a mile downstream owned by the Vigil family.  The Vigil property is located outside the river channel and is about 20 or 30 feet higher in elevation than the river below it. Tr. Vol. I, 176-77.  The water rights appurtenant to this property have been recognized by the State. *See* Consent Order for subfile CHGA-004-0006 filed January 22, 2003 (docket 7024)

Above the point of diversion for the Unnamed Ditch No. 1, water in the ditch leading to the Vigil property at one time flowed along the north boundary of the Davis tract. However, after a period of flooding, the flow of the river shifted to the southern boundary of the Davis tract. After these events, Defendant Cordova stated that he constructed the present channel across the Davis tract using a tractor and a shovel.[3] All of this occurred about 20 to 25 years ago, although Mr. Cordova was unsure exactly when. Tr. Vol. II, 186. The present channel is about 2 ½ feet wide and 2 ½ feet deep, and the top of the channel is level with the surrounding ground. There is no berm on the sides of the channel. The water in the channel in May 2002 was 1 to 1 ½ feet deep and moving in a westerly direction towards the point of diversion for the Vigil property. Tr. Vol. I, 173-74, 189.

The above described channel does not extend past the point of diversion for the Vigil property. Tr. Vol. I, 180. Water not diverted into the ditch leading to the Vigil property spills out to the west and spreads across the Cordova tract, which is how Mr. Cordova explains that the upper portion of his property is irrigated. Tr. Vol. I, 111. The area below the point of diversion for the Unnamed Ditch No. 1, the northeast corner of the Cordova tract, is extremely wet and marshy and there is no particular channel where water is confined or runs. Tr. Vol. I, 180. Water simply moves across and through the vegetation.

---

[3]    When he was first called to testify on January 28, 2003, Mr. Cordova testified that the channel appeared naturally. Tr. Vol. I, 135. When he was recalled on January 29th, he stated that after the water shifted to the south side of the Davis tract he used a tractor and shovel to start the water flowing back to the Vigil diversion, and then the water did the rest. Tr. Vol. II, 178, 187.

The State accepts the testimony of Mr. Cordova on January 29th as most likely correct in as much as non-meandering channels in flat wetland areas are unlikely to arise naturally. *See* testimony of William Dunmire, Tr. Vol. II, 140-41. In addition, there would have been an immediate need to rework the supply system to the Unnamed Ditch No. 1 after the flooding Mr. Cordova described. After the water shifted to the south side of the Davis property the Vigils were no longer able to get water into their ditch. Tr. Vol. II, 187. It certainly can be no mere coincidence that the channel feeds the ditch to the Vigil property.

Mr. Cordova testified that he irrigated the lower portion of the Davis tract and the lower portion of his own property by blocking up the water in the channel at the point where it begins to cross the Davis tract using boards and clods of earth.  The location of this diversion is marked in orange on Defendant's Exhibit 38, and a photograph of this same area appears on page 27 in the report by Susan Hoines in State's Exhibit 3.  Although hydrographic survey staff testified that any such diversion point had not been located in the field in May 2002, Tr. Vol. I, 175, 196-97; Tr. Vol. II, 8-9, or pointed out to them after they had inquired where any diversions were located during a field inspection in July 2001, Tr. Vol. II, 117-123, Mr. Cordova's testimony concerning the diversion of water from the channel was accepted by the Special Master. *See* Special Master's Report, Recommended Finding of Fact No. 4. The Special Master's Recommended Finding of Fact No. 4 also recognizes a diversion of water from the Rio Capulin (for use on the Davis and Cordova tracts) at the northern end of the channel; this is the point where the channel ends and water is diverted into the ditch leading to the property owned by the Vigils.  Although the recommended finding addresses and accepts the existence of a diversion of some type at these two locations along the described channel, the recommended findings do not state that surface water was removed or diverted out of the natural channel of the Rio Capulin.  This distinction is critical.

## II.    UNDER THE LAWS OF THE STATE OF NEW MEXICO, AN APPROPRIATION OF SURFACE WATER REQUIRES THE TAKING OR REMOVAL OF WATER FROM A NATURAL STREAM OR OTHER SOURCE OF WATER SUPPLY.

In *Harkey v. Smith,* 31 N.M. 521, 247 P. 550 (1926), the Supreme Court of New Mexico held "that, under the arid region doctrine, uncontrolled by statute, the appropriation of water is accomplished by the *taking or diversion of it from a natural stream* or other sources of water supply, with the intent to apply it some beneficial use or purpose, and consummated within a reasonable time by the actual application of the water to the beneficial use designed." (emphasis added).  In a later decision, the New

Mexico Supreme Court determined that man-made works are essential to legally establish a water right for agricultural purposes. *S. E. Reynolds v. Miranda,* 83 N.M. 443, 493 P.2d 409 (1972).

While the later *Miranda* made clear that a man-made diversion was necessary to accomplish the appropriation of water, the requirement stated in *Harkey* for the taking or diversion of the water from the stream or other source of supply remains an implicit and essential requirement. Water must be removed from the stream; that is, taken or removed from the natural channel of the stream in order to meet these requirements. For example, in the *Miranda* decision the Court pointed out that in that case there had been no evidence of any man-made diversion of waters <u>from the wash</u>. *Id.* at 444, P.2d at 410. In the absence of any man-made diversion of waters from the wash, the grazing and harvesting of grasses in the wash did not constitute an appropriation of water in the wash for agricultural purposes. *Id.* at 445, P.2d at 411. In sum, under New Mexico law, an asserted diversion of water for agricultural activities within the natural channel of a stream does not satisfy the diversion requirements stated in *Harkey* and *Miranda*.

**III.    THERE IS NO DIVERSION OF WATER OUT OF THE NATURAL CHANNEL OF THE RIO CAPULIN TO IRRIGATE EITHER THE DAVIS OR CORDOVA TRACTS.**

The tracts owned by Davis and Cordova are located within the natural channel of the Rio Capulin. The channel of the river is delineated or defined by the toe of the slopes on the south and north borders of the wetland area, slopes leading to a plateau about 40 feet above the river. Tr. Vol. I, 172. With the exception of the man-made channel crossing the Davis tract, the area between these slopes is essentially flat. In addition, it is undisputed that the entire area floods during the spring runoff period and in the summer months following a hard rain. Tr. Vol. I, 135; Tr. Vol II, 182-83, 188. It is not necessary that the entire bed of the river, or the entire wetland bottomland area in this case, carry a continuous flow of water. Under New Mexico law, a watercourse is defined as "any river, creek,

arroyo, canyon, draw or wash, or any other channel having definite banks and bed with visible evidence of the *occasional* flow of water."  NMSA 1978, § 72-1-1 (emphasis added).

The banks of the Rio Capulin in the area of the claimed tracts are the slopes on either side of the flat wetland areas.  The wetland area represents the actual riverbed of the Rio Capulin in this area, fully vegetated in most parts and frequently flooded.  Thus any irrigation activities take place entirely within this bottom land and bed of the river.  Hence, there is no taking or diversion of water from the watercourse, or removal of water out of the natural channel of the Rio Capulin, to irrigate any part of the wetland area.  Based upon the New Mexico Supreme Court's decisions in *Harkey* and *Miranda*, the State asserts that any recognition of surface water irrigation rights based upon the shifting of the natural flow of water within a riverbed area is contrary to New Mexico law.  All natural waters flowing in streams and watercourses within the State of New Mexico belong to the public. NMSA 1978 § 72-1-1.  It is the diversion of the water from the stream and out its natural channel, the possession of the water, that effects its appropriation for beneficial use in agriculture.

It should be pointed out that the description of the disputed issue for determination contained in the Special Master's report misstates the State's position.  The report states that the disputed issue for determination "is whether the tracts of land associated with these subfiles are irrigated by natural subirrigation in the flood plane of the river rather than by diversion from the Rio Capulin.  The State's position is that subirrigation occurs and there is no man-made distribution system on the subject tracts. Consequently, there is no diversion of water out of the natural channel of the river."  Special Master's Report at 3.  The State's position is correctly set out in the Final Pretrial Order filed January 21, 2003 (docket 7023): "The State's position with regard to the tracts of land under these subfiles is that the tracts are natural subirrigated wetlands in the flood plane of the river, and there is no diversion of water out of the natural channel of the river."  Whether or not the Defendants have constructed any channels

or diversions within the wetland areas themselves, there is still no diversion of water out of the natural channel of the river.  The Special Master's report does not address this question.[4]

## IV.    ANY FINDING THAT THE ENTIRE 6.1 ACRE DAVIS TRACT IS IRRIGATED BY DIVERSIONS FROM THE MAN-MADE CHANNEL IS CLEARLY ERRONEOUS.

In recommended finding No. 4, the Special Master states that "Both tracts are irrigated from the Rio Capulin . . . by the use of a man-made channel which runs between the two points of diversion . . . ."  The finding implies that the entirety of the two tracts can be irrigated from these diversions.  This is factually incorrect.  The two diversions are only capable of irrigating the area to the west of the channel.  Tr. Vol. 109-112; *see also* Defendant's Exhibits 38 and 39.  The eastern portions of the Davis tract, those portions east of the channel, lie upstream of the diversion points noted in the Special Master's report.  These portions of the Davis tract (approximately one-half of the tract) are irrigated only by natural events such as flooding, rainfall or subirrigation.  Thus recognition of a water right for the entire Davis tract, as recommended by the Special Master, is clearly erroneous. Accordingly, even if the Court concludes that the claimants have met the requirements set out in *Harkey* and *Miranda*, the Court should reject recommended finding No. 4 and recommit the Davis claim to the Special Master for a determination of the area to the west of the channel. The area to the east of the channel should be classified as "no right" or without water rights.

## V.    THE DEFENDANTS FAILED TO PROVE THAT SPREADING SURFACE WATER WITHIN THE NATURAL CHANNEL OVER THE CLAIMED TRACTS DURING PERIODS OF LOW FLOW IN THE RIO CAPULIN REPRESENTS THE BENEFICIAL USE OF WATER.

---

[4]    The State directly raised this question in its proposed findings: "There is no man-made structure for the diversion and transport of surface water out of the natural channel of the Rio Capulin used in connection with the claimed tracts."  State of New Mexico's Proposed Findings of Fact and Conclusions of Law filed May 2, 2003, proposed finding 14.  The State discussed the same issue in its closing argument on January 30, 2003.  Tr. Vol. III, 38-41.

The Defendants bore the burden of proof with respect to each of the elements necessary to prove their claims to the appropriation of surface water. *See* Special Master's Report at 5. While cultivation of crops is a recognized beneficial use of water, *see id.*, there was no testimony from any expert witness at the hearings that spreading surface water over the wetland areas where the Defendants tracts are located would have any incremental or positive effect upon the growth of the vegetation in question. The sum of the testimony given to show that the claimed irrigation represented the beneficial use of water concerns harvesting yields in the years 2001 and 2002. Mr. Cordova stated that he was able to harvest 2,000 bales of hay from the two tracts in 2001, but was unable to harvest anything in 2002. During the first part of the year in 2002 he testified that there was no water and he couldn't irrigate, and then later in the year the tracts were flooded after rainstorms and it was too wet. Tr. Vol. I, pp. 114-117. He also testified that if he was unable to irrigate he would not be able to have the kind of production that he had in 2001. Tr. Vol. I, 128-29.

Mr. Cordova's testimony is insufficient for several reasons. First, it is unclear from his testimony if the lack of the water in the early part of 2002 to which he refers is simply the absence of natural flooding from spring runoff following a very dry winter with little or no snow pack in the mountains. The usual sequence of events is that the entire riverbed is flooded from bank to bank during this time. Tr. Vol. II, 182-83. Mr. Cordova describes this flooding as "self-irrigation." Tr. Vol. I, p. 126 ("Well, usually it floods the property and it kind of self-irrigates."). Thus when he testifies as to the necessity for irrigation, or the lack of water, it is not at all clear whether or not this includes natural flooding events from spring run off or summer rainstorms, which would have nothing to do with any diversion of water from the channel crossing the Davis tract during periods of low flow. There is a critical element of causation lacking in Mr. Cordova's testimony, and the testimony is insufficient to prove that the decrease in yield was a result of an inability to divert water from the channel.

The second but related reason why this testimony appears insufficient is that water actually was present in the channel during May of 2002, and that water actually did flow to the point of diversion on the northwest corner of the Davis tract and then spread out upon the Cordova tract below. As noted in the introduction to these objections, water in the channel on May 21, 2002 was 1 to 1 ½ feet deep and moving in a westerly direction towards the point of diversion for the Vigil property. Tr. Vol. I, 173-74, 189. The Cordova tract below the point of diversion for the Vigil tract was wet and marshy at the time. Tr. Vol. I, 180. Thus it appears that water was available in the channel in late May of 2002 to divert onto the properties at either of the two ends of the channel crossing the Davis tract. While water was not observed by the hydrographic survey staff being diverted at the southern end of the channel, nonetheless it was available. Further, this source of water does not dry up even in a dry year like 2002. Mr. Cordova testified that even in a dry year like 2002 there is small amount of water coming down from the canyon located to the east of the Davis property. Tr. Vol. I, 138. Again, this evidence points to factors other than an inability to divert water from the channel as the causal explanation for the difference in yields of hay in 2001 and 2002.

In addition, the Defendants presented no expert testimony from an agronomist or botanist to show that spreading surface water from the channel on the two tracts would have an incremental or positive effect upon the growth of the vegetation in question. In the absence of this testimony, the State was not required to present expert witness testimony to rebut such claims, or to show that the existence of subsurface water, or natural flooding, would preclude the need for diversion of water from the channel. *See* Special Master's Report and Recommendations at 6. The Defendants bore the burden of proof, including the burden to show that spreading water from the channel across the two tracts represented the beneficial use of water. The State respectfully asserts that the Defendants failed to meet this burden.

## VI.      CONCLUSION

The subject lands are undisputed wetlands located in the riverbed of the Rio Capulin.  New

Mexico law requires the taking or diversion of water from a stream or watercourse, and any spreading

of water within the natural channel of a river, a natural wetland in this case, does not meet these

requirements.  For this reason and others stated above, the State requests that the Court reject the Special

Master's Report and determine that the Defendants have no surface water rights appurtenant to the

claimed tracts of land.  In the event the Court recognizes the Defendants' claims, the State requests that

the Court recommit the Davis claim to the Special Master for a correct mapping and determination of

the area to the west of the channel, the only area of the Davis tract that can be irrigated from the two

points of diversion described in the Special Master's Report.

Respectfully submitted,

  /s/ Ed Newville
EDWARD G. NEWVILLE
Special Assistant Attorney General
Office of State Engineer
P.O. Box 25102
Santa Fe, NM 87504-5102
(505) 827-6150

## CERTIFICATE OF SERVICE

I hereby certify that copies of the State of New Mexico's Objections to Special Master's Report
and Recommendations on Disputed Subfiles was mailed to following persons on September   2  , 2003.

  /s/ Ed Newville
Edward G. Newville

### RIO CHAMA SECTION 5 SERVICE LIST

Special Master Vickie L. Gabin
USDC-DCNM
P.O. Box 2384
Santa Fe, NM 87504-2384

Karla McCall, Data Manager
1315 Sagebrush Dr. SW
Los Lunas, NM 87031

Bradley S. Bridgewater, Esq.

David W. Gehlert, Esq.
USDOJ-ENRD
999 18th ST., Suite 945
Denver, CO 80202

John W. Utton, Esq.
Sheehan, Sheehan & Stelzner PA
P.O. Box 271
Albuquerque, NM 87103-0271

Fred J. Waltz, Esq.
P.O. Box 6390
Taos, NM 87571-4010

Mary E. Humphrey, Esq.
P.O. Box 1574
El Prado, NM 87529-1574

Fred Vigil
NM Acequia Commission
c/o Jessie Bopp
Depart. Of Finance & Admin.
Bataan Memorial Building
Santa Fe, NM 87503