IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

STATE OF NEW MEXICO ex rel.,
State Engineer,

      Plaintiff,                       No. 69cv07941-BB-ACE
                                        RIO CHAMA STREAM SYSTEM
      vs.                            Section 7

ROMAN ARAGON, et al.,

      Defendants.


SUPPLEMENTAL BRIEF IN SUPPORT OF
MOTION TO SET ASIDE DEFAULT JUDGMENT (DOCKET #7901)
AND IN OPPOSITION TO MOTION FOR
RULE 11 SANCTIONS (DOCKET #7928)

Movant Henry Coors submits this Supplemental Memorandum in Support of his

Motion to Set Aside Default Judgment entered against him on October 20, 2004 (Docket

#7626).  Coors contends that the default should be set aside pursuant to Rule 60(b)(1)

of the Federal Rules of Civil Procedure based upon mistake, inadvertence, or excusable

neglect or Rule 60(b)(6), any other reason justifying relief from the operation of the

Judgment.  At issue in this case is the right to irrigate 7.3 acres of land in the vicinity of

Rutheron, New Mexico.

Facts

In November 1988 Henry Coors acquired 120 acres of land, which included the

right to irrigate 35.3 acres (Transcript, page 31, line 8-18) as shown on a license issued

by the State Engineer in File No. 1545 – 1699.  The land was irrigated in 1989, but

thereafter the land was not irrigated.  On January 31, 1992, Coors sold 56 acres to

1

Mauldin and DeMill, which included the right to irrigate 8.0 acres.  (Transcript, page 39, line 16-21.)

Coors then decided to subdivide his remaining land into 21 lots and to use some of the remaining water rights to provide domestic water to the subdivision.  Coors then conveyed 2.0 acre feet from 2.67 unidentified acres to the Rutheron Water Association on May 7, 1993 (Transcript, page 39, line 4-10) and Coors conveyed another 2.0 acre feet from 2.67 unidentified acres to Rutheron Water Association on March 12, 1996. (Transcript, page 40, line 1-7.)  At the time that Coors sold the lots in the subdivision, Coors told each purchaser that one-quarter acre foot of water rights would be conveyed to the Rutheron Water Association for their benefit but that the lot purchasers would acquire no additional water rights (Transcript, page 74, line 20; see Exhibits 3-12 attached to Coors Affidavit Docket #7901).  (Please note that Movant's Exhibits 3-12 are attached to Docket #7901.)

Coors then decided to build his own water system (Transcript, page 41, line 24) to serve the 21 lots in Ft. Heron Preserve Subdivision and 16 parcels located immediately south of the subdivision and filed an application with the State Engineer to change the purpose of use from irrigation to domestic and the point of diversion from the Willow Creek Mesa Ditch to an infiltration gallery.  (Transcript, page 42, line 8-15.) Because so many problems were inherent in that application, it was withdrawn or denied.

Coors then reached an Agreement with Rutheron Water Association for Rutheron to supply water to Ft. Heron Preserve Subdivision and the adjacent parcels of land. (Transcript, page 42, line 16-24; Respondent's Exhibit "4".)  Coors filed an Application

with the State Engineer's Office on December 7, 1998, to dry up 14.66 acres to make

up for evaporation losses from two ponds located on the property and another

Application on October 22, 1999, to dry up 9.81 acres to provide domestic water so that

10 acre feet of water rights could be transferred to Rutheron Water Association.

(Transcript, page 42, line 25-page 43, line 14.)  The 9.81 acres was based on a CIR of

1.02 (Transcript, page 44, Line 15-24) and included the 4 acre feet previously

transferred to Rutheron in the 1993 and 1996 applications.  So that there would be no

question regarding ownership of the water rights in both 1999 Applications, Coors

obtained Conformation Agreements and Disclaimer and Quitclaim of Water Rights from

the owners of all water rights in the benefitted area including Tim and Diana Andrews

(Movant Exhibits "3" and "19".)

      Protests to the 1999 Applications were filed by Rio Arriba County and the Willow

Creek Mesa Ditch Association (Transcript, page 47, line 16-22) and it was agreed

among the applicant, Protestants and the State Engineer to hear and resolve the pond

evaporation case before the Application for domestic water was considered.  After the

Hearing before the State Engineer on the pond evaporation case was heard, Coors sold

their home (lot C) to Steve and Jamie Padilla in November, 2000.  (Respondent's

Exhibit "5".)

      Finally in June 2001, the State Engineer issued its decision determining that

14.66 acres could be dried up to make up the water lost to evaporation in the two

ponds.  (Transcript, page 49, line 15-20; Plaintiff's Exhibit "8".)  Within 2 weeks Coors

asked the State Engineer to proceed on the 1999 Application involving water rights to

be transferred to Rutheron Water Association. (Transcript, page 52, line 14-17) (Movant

Exhibit "18").  Rio Arriba County withdrew its protest and the case was remanded to the Water Rights Division on June 10, 2002, but no action was taken until January 2005. Only two issues remained to be resolved by the Water Rights Division.  (Transcript, page 54, line 7-14.)  (1) Could another more correct CIR be used for the Water Rights transferred to Rutheron in the 1993 and 1996 applications and what CIR would be applied to the remaining 7.3 acres of land and (2) where would the remaining irrigated land be located after sufficient water rights had been transferred to Rutheron?  To answer this question, the SEO called Coors and was told to locate the remaining irrigated loan on lots D, F, and G on the north boundary of the subdivision. (Transcript 57, line 17-page 58, line 3.)  When no decision was forthcoming, Coors contacted Buck Wells at the SEO and was told there was some problem.  (Transcript, page 55, line 7-23.)

If SEO had allowed the 1993 and 1996 water rights transfer to be reopened for the 4 acre feet and if the most generous CIR of 1.02 had been used, 9.81 acres would have been dried up in order to provide Rutheron with 10 acre feet of water rights.  This would have resulted in 2.83 acres remaining in lots D, F and G, which could be irrigated. Depending upon whether the 1993 and 1996 water rights transfers could be reopened and the value of the CIR, the remaining irrigated acres would run from .48 acres to 2.83 acres.  On remand, all the SEO had to do was to determine if the 1993 and 1996 applications could be reopened and what was the appropriate CIR to determine what irrigated acreage remained.  When the SEO called Coors and asked where the remaining irrigated land was to be located, Coors thought this matter would be resolved quickly (Transcript, page 128-130).

If the Water Rights Division had addressed this case and decided it would not reopen the water rights transferred to Rutheron in 1993 and 1996 and if it applied the CIR of .88 acre feet per acre that it said it would apply when the case was pending before the Hearings Unit after approving 6 acre feet to be transferred to Rutheron, there would have been .48 acre of irrigated land to be located in lots D, F and G.  The State Engineers Office was unable to explain why they failed to consider this case after it had been remanded to them in June 2002.  (Transcript, page 35, line 9-12.)  If the SEO had acted timely, the issues in this case would have been resolved.  Andrews did not file a protest after publication of either of the notices for the two applications filed in 1999.  Padilla never moved to intervene in the proceeding pending before the SEO for domestic water for Rutheron Water Association.

ARGUMENT

POINT I
COORS HAS STANDING TO MAINTAIN
HIS CLAIM IS THIS PROCEEDING

In the Court's Memorandum Opinion and Order (Docket # 8006), the Court raised the issue of standing and required that Mr. Coors demonstrate that he has standing to seek to have the Default Judgment set aside (Memorandum Opinion and Order, page 4).  The Court ruled Mr. Coors must show that he has some claim to the use of subject water rights to be properly before the Court on this matter.  A further requirement placed upon all of the parties was that they provide the Special Master with any information they have regarding the identity of the current owner of the subject water rights in order that the current owner may be made a party to this adjudication.

5

At the hearing, Mr. Coors testified that there are three possible bases for his standing in this case.  The first basis is that even if after the final transfer to Rutheron Mutual Domestic Water Association (hereinafter Rutheron) was approved, there would still be approximately one-half acre of water right remaining (Transcript, page 27, line 20).  He did indicate that he intended to place this water right on the northern lots to be used for irrigated pasture instead of domestic water.  These lots include lots originally acquired by Andrews.  The second basis for standing is that Mr. Coors, as developer, had conveyed 10 acre feet to Rutheron upon condition that they be applied to the benefit of the lots in his subdivision.  Mr. Coors, as developer, had the obligation to provide water to the lots and believes that he has a right to see that those water rights are reserved for those lot owners (Transcript, page 29, line 1-20).  Initially, Mr. Coors had stated that he had believed that he had done everything necessary to transfer the water rights to Rutheron and that he would no longer have a meaningful interest in water rights in that area and therefore would not be concerned about a Default Judgment entered against him.  This has changed for several reasons including reasons which did not occur until after the Court entered its Memorandum Opinion and Order.  In close proximity to the hearing, Rutheron informed the Court that it did not want to incur the expense of being involved in this proceeding and is apparently repudiating or rescinding the contract between itself and Mr. Coors to provide water to the subdivision lots.  If Rutheron's position is that it is disavowing the contract or rescinding the contract, then it would appear that the water rights which were being transferred to Rutheron would be restored to Mr. Coors.  The Rutheron contract is Respondent's Exhibit "4".

6

The Court's Memorandum Opinion and the Special Master's Order also required the parties to provide the Special Master with any information they have regarding the identity of the "current owner" of the subject water rights.  This would appear to the parties to have been Rutheron and that Rutheron was a real party in interest, however, given Rutheron's position and apparent repudiation of the recission of the transfer, it would now appear that the individual lot owners have a stake in the outcome.  They should be made parties to this litigation.  As Mr. Coors stated throughout this proceeding, his goal was that each lot have sufficient water (.25 acre feet) for domestic use.  The individual Fort Heron lot owners, which includes Mr. Coors' lot, are listed in Coors' Affidavit Docket # 7901, page 2, and possibly the owners in the Coors' Family Division.

New Mexico Courts have addressed the issue of standing in several different contexts.  In the context of the Motor Vehicle Franchising Act, the Court held in <u>Key v. Chrysler Motor Corporation</u>, 918 P.2d 350, 121 N.M. 764, 1996 N.M. SC-038, that a claimant must have a personal stake in the outcome of the case.  Claimant must allege and prove both injury in fact and a traceable causal connection between the claimed injury and the challenged conduct.  The case goes on to discuss standing under a particular statute further holding that interests sought to be protected must be within the zone of interest to be protected or regulated by statute.  This element is not present in this case.  The New Mexico Courts have also held that once an injury has been shown, the extent of the injury required to give standing to sue can be very slight.  <u>DeVargas Savings and Loan of Santa Fe v. Campbell</u>, 87 N.M. 469 533 P.2d 1320 (1975).

In reviewing the Tenth Circuit and United States District Court in the District of New Mexico cases on standing, it would appear that the great majority of the cases address issues with specific statutes such as antitrust or environmental issues.

One example is a decision by Judge Brorby in <u>Committee to Save the Rio Hondo v. Leonard Lucero, et al.</u>, 102 F.3d 445 (1996) U.S. App. Lexus 31330 (10th Cir. 1966), in which the Court allowed a committee standing.  The Tenth Circuit addresses the requirements for standing:  First, an "injury in fact" an invasion of the legally protected interest which is "concrete and particularized" and "actual or imminent".  Second, a causal connection between the injury and the conduct complained of; that is traceable to the challenged action.  Third, the likelihood that the injury will be redressed by a favorable decision (Committee supra at 447).  Plaintiff must show an increased risk to the litigant's concrete interests.  Here, Mr. Coors claims some small residual water rights, an interest as a developer in finishing his development and supplying water to subdivision lots which he sold and an ownership interest in one of the affected lots. Other than Andrews, Padilla and Coors, the remaining lot owners in the subdivision are not present in this case.  Mr. Coors undertook the burden of completing the State Engineer's application process to insure that the water rights were properly allocated throughout the subdivision for the ponds and domestic water.  This would seem to be analogous to organizational standing although would be more direct because of the contract relationship between the developer and his buyers.  Coors also believes that this is even more true now that the transferee, Rutheron is rescinding the transfer of the water rights and repudiating its obligations to supply water to some of the lots in the subdivision.  Coors believes that he has standing to assert his claim in this proceeding.

POINT II

THE WATER RIGHTS DO NOT BELONG
TO ANDREWS AND PADILLA

Andrews and Padilla filed their claims for water rights in this case based on the

fact that their land was located in the benefitted area and conveyance of the land

carried with it the appurtenant water rights to irrigate the land.  NMSA § 72-1-2 (1978

Comp).  This was the same claim made by Turner in Turner v. Bassett, 111 P.3d 701

(NM 2005), 2005 – NMSC – 009.  Bassett, the previous owner, applied to the SEO to

change the place and purpose of use for irrigation water rights and was granted a

permit from the State Engineer.  The permit contained conditions some of which had not

been fulfilled when Bassett sold the land to Turner without reserving the water rights.  At

the time of sale in 1985, the land was not being irrigated, Turner filed his claim in 1998.

At issue was whether the water rights had been severed at the time of sale.  The NM

Supreme Court held, "Considering the statutes, regulations and practice of the State

Engineer, a better approach to the issue of severance is to recognize the issuance of a

permit as giving rise to a presumption that the land and water rights are no longer

appurtenant."

The difference between Turner v. Bassett, supra, and this case is that a permit

from the State Engineer had been issued in the Turner case whereas the application for

permit was pending before the State Engineer in this case.

Coors informed all lot purchasers that:

1.      no water rights went with the land, and

2.      the available water rights would be used to make up for evaporation

losses from the ponds and for providing domestic water to each lot

through Rutheron.

Coors advised each lot purchaser that one-quarter acre foot would be conveyed

to Rutheron for the lot owners benefit (Transcript, page 74, Line 22-23; Transcript, page

82, Line 5-15) and none of the land was being irrigated at the time Coors sold it.  This

agreement with each lot purchaser was put in written form in Conformation Agreements

and Disclaimer and Quitclaim of Water Rights.  (Transcript, page 165, Line 22-page

166, Line 1; Movant's Exhibits 3-12 and 19.)  Andrews understood this when he signed

the Disclaimer and Quitclaim Deed.  (Transcript, page 154, Line 25-page 155, Line 4.)

Water rights for the pond and for domestic water benefitted all lot owners and it was

intended that all lots would share in the benefits and burdens of water use.  Whatever

water rights remained after providing for domestic water and pond evaporation, would

remain with the Northern lots D, F and G.  (Transcript, page 166, Line 24-page 167,

Line 4.)

Even is the water rights were appurtenant at the time of purchase, Andrews

executed the Conformation Agreement and the Disclaimer and Quitclaim of Water Right

conveying whatever water rights they may have had to Coors so that he could complete

the water rights transfer necessary to complete the Ft. Heron Development.

Coors contends that his pending application to change the purpose of use from

irrigation to pond evaporation and domestic use together with his discussions with

Padilla regarding the pending applications at the time of sale in November 2000, are

sufficient to overcome any presumption that the water rights had not been severed at

the time of sale.  The purpose of the law is to protect purchasers of land so that the
seller cannot claim the water when purchaser thought he was purchasing irrigated land.
This is not the case because the land had not been irrigated for 12 years and Padilla
was told that no water rights came with the land and that applications were pending to
transfer waters for evaporation losses from the ponds and for domestic use.
(Transcript, page 79, Line 9-24.)  Padilla should not enjoy the benefit of the water rights
that were used to support the ponds, which he and his neighbors overlook and enjoy.

In Turner v Bassett, supra, Turner was aware of Bassett's continued interest in
the well and that he might have to acquire water rights from Bassett to develop his
property.  Thirteen years later, Turner became aware that Bassett had not complied with
all the conditions and then he filed his claim.  Padilla only became of his right to claim
water rights from his wife and when he talked to the Andrews.  (Transcript, page 153,
Line 18-21.)  He never sought to intervene in the cases pending before the State
Engineer and filed his claim the last date before the deadline for filing claims.  This is
not a question of a purchaser not being able to use land as he intended but whether the
purchaser is entitled to a windfall for water rights he does not use.

At the very least, Coors has demonstrated that he has a meritorious defense.  To
establish a meritorious defense, Defendant need only suggest the existence of facts
which, if proven at trial, would constitute a meritorious defense.  Likelihood of success
on the merits is not required.

POINT III

THE DEFAULT JUDGMENT AGAINST COORS
SHOULD BE SET ASIDE

To determine whether to set aside a default, this Court looks to Tenth Circuit cases as well as cases in this district.  In Cortez v. New Mexico Department of Health, docket number 91cv1105 (Docket #54), Judge Parker outlined the factors to be considered as well as the applicable Tenth Circuit cases.  Judge Parker notes as follows:

Defendant seeks to set aside the Default Judgment pursuant to Fed. R. Civ. P.60(b)(1) and (6). [Rule 60(b) provides: "On motion and upon such terms as are just, the Court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect;...(6) any other reason justifying relief from the operation of the judgment."] A District Court has substantial discretion in connection with Rule 60(b), and "there are very few right and wrong answers" in setting aside Default Judgments. Pelican Production Corp. v. Marino, 893 F.2d 1143, 1147 (10th Cir. 1990).

> Default Judgments are generally disfavored, and the preference is for the Trial Court to hear the merits of the case.  Meadows v. Dominican Republic, 817 F.2d 517 (9th Cir. 1987).  "However, this judicial preference is counterbalanced by considerations of social goals, justice and expediency, a weighing process which lies largely within the domain of the trial judge's discretion."  Gomes v. Williams, 420 F.2d 1364, 1366 (10th Cir. 1970).  To set aside a Default Judgment, the Movant must not only establish justifiable grounds, such as excusable neglect or extraordinary circumstances, but must also demonstrate the existence of a meritorious defense.  In Re Stone, 588 F.2d 1316, 1319 (10th Cir. 1978).

In <u>Tillman Long v. Mark Romero dba Mid-Valley Auto Sales</u>, . 00cv524, (Docket #

14) Judge Conway also describes the legal standard as containing three factors:

> Courts have established three factors for consideration in
> deciding whether to set aside a default: 1) whether the
> moving party's culpable conduct caused the default; 2)
> whether the moving party has a meritorious defense; and 3)
> whether the non-moving party will be prejudiced if the default
> is set aside. [I am aware that the factors in Timbers Preserve
> were enumerated in the context of Fed. R. Civ. P. 60(b).
> However, the standard is the same whether the Court is
> asked to set aside an entry of default under Rule 55(c) or a
> Default Judgment under Rule 60(b).  See 6 James Wm.
> Moore, Moore's Federal Practice 55.10[1] (2d ed. 1996)
> (discussing the three factors in the context of both rules).]
> <u>United States v. Timbers Preserve, Routt Co.</u>, CO, 999 F.2d
> 452, 454 (10th Cir. 1993).  Generally a party's conduct will be
> considered culpable only if the party defaulted willfully or has
> no excuse for the default.  Id.

A.    <u>Coors Has Demonstrated Excusable Neglect</u>.

Coors never received copies of any of the claims, notices or Default Judgment

entered in this case in the late summer and fall of 2004 (Transcript, page 60, line 1).

Coors asserts that his failure to acquire and contest the claims of Andrews and Padilla

is due to excusable neglect.  After selling the house to Padilla in November 2000, Coors

lived full-time in a motor home for five years.  He had his mail sent to the Escapees RV

Club in Livingston, Texas, so that it could be forwarded to him.  (Transcript, page 58,

Line 20-25; Transcript, page 112, Line 7-10.)  This system worked well when Coors was

not traveling but in the summer when Coors moved from place to place, it did not work

well.  Escapees was an agent to forward mail and not an agent to receive mail or for

service of pleadings.  Escapees never opened mail and waited for directions where to

send mail.  In his affidavit (Docket #7932 Exhibit A), Coors accounts for the relevant

time when notices were sent and hearings held on the claims of Andrews and Padilla, which shows that he did not get notice of such hearings.  When Coors received the letter from the SEO on February 25, 2005, he took prompt action to set aside the Default Judgment, which had been entered in this case.  Unfortunately, the notices were sent and hearings held while Coors was traveling.  Coors should not be deprived of his water rights when he was not actually aware of the pending matter.  Inability to receive the claims and notices should be considered as excusable neglect in order to set aside the default judgment.

      B.   <u>Mistake.</u>

Although Mr. Coors had notice of the pendency of the action and accepted service, he believed that he had taken all of the action necessary to transfer the water rights to Rutheron Water Users Association and that he would be willing to let the matter go by default.  As discussed above, what happened was largely due to delay in the State Engineer's office.  As a result of default ruling in this Court, the State Engineer's office denied Mr. Coors' application to transfer his rights to Rutheron.  This left Mr. Coors caught in a vicious circle.  He seeks now to complete the process of providing domestic water for the lots in the Fort Heron subdivision but it would appear now that he must first reestablish his water right here so that it can be transferred through the office of the State Engineer.

      C.   <u>Prejudice to the Non-Moving Party</u>.

The third issue to be considered is whether the non-moving party will be prejudiced if the default is set aside is somewhat unusual in the case of the water rights adjudication.  Coors notes that this case has been pending since 1969 and it would

14

appear to Coors that it will be pending for sometime hereafter.  Certainly, closing as many sub-files as possible will help move the case forward, however, upholding the default in this case might only complicate matters.  The Court directed counsel to provide any additional information they have regarding the identity of the current owner of these rights.  Mr. Coors in his Affidavit attached to his Motion to Set Aside Default Judgement, docket #7901, listed several individuals, including Mr. Coors, who owned lots and believed that they would continue to have one quarter acre foot of water rights for domestic purposes.  These individuals are adversely affected by these proceedings and most are not present before the Court.  This should be considered not only in the context of standing but in the concept of balancing in harm to Coors and others if the Default Judgment is not set aside.

The parties presented almost a full day of testimony to the Special Master.  Coors believes he has presented all evidence that would have been presented at a hearing on the merits.  Padilla and Andrews and the State also appear to have presented all of their testimony.  The case could easily be remanded to the Special Master for determination on the merits with little or no additional burden.

D.      Rule 60(b)6).

Finally, Rule 60(b)(6) provides that relief may be granted for any other reason justifying relief from the operation of judgment.  Rule 60(b)(6) has been described as a grand reservoir of equitable power to do justice in a particular case.  Cashner v. Freedom Stores, Inc., 98 F.3d 572 (10th Cir. 1996).  Here, the unfortunate consequences of the default judgment against Coors may be that several lot owners are left without domestic water.  Justice would be served setting the default judgment aside.

If Coors is successful on establishing his water right, then he can complete the work

necessary to provide water to the residential lots.

POINT IV

RULE 11 SANCTIONS SHOULD NOT BE IMPOSED

In response to the Motion of Padilla and Andrews for sanctions, Coors would

show the Court as follows:

Claimed "false assertion of fact no. 1" relates to whether Mr. Coors had notice of

the September 20, 2004, scheduling conference.  Mr. Coors' factual basis is that he did

not receive notice of any of the proceedings.  This is detailed in his Affidavit attached to

Docket #7932 and also in his testimony cited supra under excusable neglect.

With respect to the claimed "false assertion of fact no. 2", it would appear that

there is some confusion or inaccuracy in the allegations; however, the Affidavit that was

attached to the Motion, the same pleading Docket #7901, is not challenged.

What was confusing about this case, especially to newly retained counsel rushing

to get the motion  to set aside default on file, was that there were numerous applications

before the State Engineer's office, some arising early during the development and some

of which contained applications to reopen earlier files.  In fact, the four-acre feet which

had been previously transferred to Rutheron were included in the subsequent

application to transfer ten-acre feet.  The deed for the ten-acre feet is attached to Mr.

Coors' Affidavit as Exhibit "13".  Four-acre feet had been previously approved as a

result of an earlier hearing.  Since the Affidavit appears to cure the inconsistency or

confusion in the pleading, it is difficult to believe how parties could have been misled by

16

the claimed false assertions.  Coors believes that Rule 11 sanctions would not be appropriate in this matter.

POINT V

RULE 16 SANCTIONS

The Court's Order also required Mr. Coors to present evidence to justify his failure to appear at the September 20, 2004, status conference and the June 14, 2005, status conference.  Mr. Coors, in his Affidavit (attached to pleading  Docket #7932) details his whereabouts and his failure to receive notice.  (See also Transcript, pages 58-60).  Mr. Coors did not receive notice of the June 14, 2005, status conference; however, Mr. Reardon admits that he did.  Mr. Reardon received the hearing notice of June 14, 2005, and mishandled it.  Mr. Reardon would have attended the June 14, 2005, status conference.  Mr. Coors' presence would not have been necessary, therefore, Mr. Coors should not be sanctioned for missing the June 14, 2005, status conference.  Mr. Reardon admits that the conduct is sanctionable, but requests that any sanction be minimal.  In mitigation, it is unlikely that much could have been accomplished at the status conference.  The matter was discussed with Mr. Newville after June 14, 2005, and the consensus of the parties was that an agreed Order could not be submitted given the present posture of the case and the positions of Padilla and Andrews.  While this is not offered as any excuse for failure to attend the status

17

conference, it would appear that the harm arising from failure to attend the 2005 status conference would be slight.

WALTER L. REARDON, JR., P.A.

*Filed electronically*

_____
WALTER L. REARDON, JR., 2158
Attorney for Henry G. Coors
3733 Eubank Blvd., N.E.
Albuquerque, NM 87111-3536
Telephone: (505) 293-7000
Fax: (505) 293-0831
Email: walter@reardonlawnm.com

We hereby certify that a copy of the foregoing pleading was sent by the method(s) indicated below to the person(s) and indicated address(es) listed below on the 13 day of January, 2006.  If by facsimile or email, the transmission was reported as complete and without error.

*    s/ Walter L. Reardon, Jr.*

Special Master Vickie L. Gabin, sent via first class mail
USDC-DCNM
P. O. Box 2384
Santa Fe, NM 87504-2384

Karla McCall
Data Manager, sent via first class mail
1315 Sagebrush Drive, S.W.
Los Lunas, NM 87031

Bradley S. Bridgewater
David W. Gehlert, sent via first class mail
USDOJ-ENRD
999 18th Street, Suite 945
Denver, CO 80202

John W. Utton, sent via first class mail
Sheehan, Sheehan & Stelzner, PA
P. O. Box 271
Albuquerque, NM 87103-0271

Paula Garcia, sent via first class mail
NM Acequia Association
607 Cerrillos Road, Suite F
Santa Fe, NM 87505

Benjamin Phillips
John F. McCarthy
Rebecca Dempsey, sent via first class mail
White, Koch, Kelly & McCarthy, PA
P. O. Box 787
Santa Fe, NM 87504-0787

Lester K. Taylor, sent via first class mail
Nordhaus, Haltom, Taylor,
Taradash & Bladh, LLP
405 Dr. Martin Luther King Avenue, N.E.
Albuquerque, NM 87102-3541

Susan Jordan, sent via first class mail
1239 Paseo de Peralta
Santa Fe, NM 87501

Tessa T. Davidson, sent via first class mail
The Davidson Law Firm
P. O. Box 2240
Corrales, NM 87048

Marcus J. Rael, Jr., sent via first class mail
500 4th Street, N.W., Suite 200
Albuquerque, NM 87102

Pierre Levy, sent via first class mail
Law Offices of Daniel J. O'Friel, Ltd.
P. O. Box 2084
Santa Fe, NM 87504-2084

John P. Hays, sent via first class mail
Cassutt, Hays & Friedman, PA
530-B Harkle Road
Santa Fe, NM 87505

19

Daniel Cleavinger, sent via first class mail
P. O. Box 2470
Farmington, NM 87499

Ted J. Trujillo, sent via first class mail
P. O. Box 2185
Espanola, NM 87532-2185

Karen L. Townsend, sent via first class mail
120 East Chaco
Aztec, NM 87410

NM Acequia Commission, sent via first class mail
Fred Vigil, Chairman
Dept. of Finance & Administration
Local Government Division
Bataan Memorial Building
Santa Fe, NM 87503

Kurt J. Van Deren, sent via first class mail
Hatch, Allen & Shepherd, PA
P. O. Box 94750
Albuquerque, NM 87199-4750

Gary S. Friedman, sent via first class mail
Cassutt, Hays & Friedman, PA
530-B Harkle Road
Santa Fe, NM 87505

Peter B. Shoenfeld, sent via first class mail
P. O. Box 2421
Santa Fe, NM 87504-2421

Ernest L. Padilla, sent via first class mail
Padilla Law Firm, PA
P. O. Box 2523
Santa Fe, NM 87504-2523

Jeffrey H. Albright
Cynthia A. Loehr, sent via first class mail
Jontz, Dawe Gulley & Crown, PC
201 Third Street, N.W., Suite 1950
Albuquerque, NM 87103-1027

Frank M. Bond, Esq., sent via first class mail
The Simmons Law Firm LLP
P O Box 5333
Santa Fe, NM 87502-5333

Ed Newville, sent via first class mail
Special Assistant Attorney General
Office of the State Engineer
P. O. Box 25102
Santa Fe, NM 87504-5102

Sent By: Karen Madison
Sender's Fax: (505) 293-0545
Sender's Email: walter@reardonlawnm.com