IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

STATE OF NEW MEXICO ex rel.,
State Engineer,

                 Plaintiff,        No. 69cv07941-BB-ACE

   -vs-                       RIO CHAMA STREAM SYSTEM
                                 Section 7
ROMAN ARAGON, et al.,         Subfile CHRU-004-0044

               Defendants.

<u>SUPPLEMENTAL POST-TRIAL MEMORANDUM</u>

The Court required that Padilla and Andrews demonstrate that they have standing to assert claims to the water rights associated with this subfile, and any additional information they have regarding the identity of the current owner(s) of these rights.  In addition, the issues set forth by the Court are:

1. Does Mr. Coors have standing, i.e., does he have "some claim to the use of the subject water rights to be properly before the Court in this matter."

2.  Are Defendants Padilla/Andrews proper claimants.

3.  Whether there exists any reason justifying setting aside the default judgment.

4.  Who are the current owners of the subject water rights, and therefore, proper parties to this adjudication.

5. Are there any reasons justifying setting aside the default judgment for the purpose of completing the permit application process, including any legal authorities supporting those reasons.

6. Was Mr. Coors' failure to appear at both the September 20, 2004, and the June 14, 2005, status conferences substantially justified or do other circumstances make an award of expenses unjust?  Has Mr. Coors presented evidence that substantially justifies that failure?

7. Because the Special Master ordered that she would hear "4. Any other matter the parties deem relevant to the instant action", it is or may be an issue whether Mr. Coors' false statements to the Court respecting his claimed "pending" or "granted" State Engineer permit application are properly before the Court under the pending motion for Rule 11 sanctions.  It is not clear to counsel that this matter has (or has not) been referred by the Court to the Special Master.  It was discussed at Tr. 136, and is briefed herein and can be ignored by the Court if excessive, or considered if it is within the issues the Court intended to be briefed.

<u>Background and Facts</u>

The water rights in question were permitted in the 1920s to the Willow Creek Mesa Ditch and subsequently vested pursuant to a license from the State Engineer.  <u>See</u> the Rio Chama Hydrographic Survey on file herein.  All real estate involved in the issues before the Court is a part of Fort Heron Preserve subdivision. Henry Coors was the subdivider.  Padilla bought Lot C and Andrews bought Lots B and D by warranty deeds from Henry Coors.  Andrews

purchased Lot F from third parties Moore and Zuschlag, who had purchased from Coors.

None of the deeds from Coors contained any reservation of the irrigation water rights appurtenant to the land, and at the time of the execution and recordation of those deeds there was no permit to move those water rights away. (Even if there were a permit, under the Bassett case, discussed infra, that would not be an operative fact.) Hence the water rights were appurtenant to the land at the time of the conveyances to Padilla and Andrews.

The Andrews purchased their property from Mr. Coors on his assurance that it had water rights and they could irrigate the land as pasture for their horses.  They informed Mr. Coors that this was their purpose and their requirement.  Tr 138, 139.

The Padilla deed to Lot C was executed on November 7, 2000, and filed for record on November 14, 2000.  The Andrews deeds were executed on December 7, 1994 (Lot B), July 12, 1995, (Lot D), and October 15, 2003 (Lot F).  See Respondents' Exhibits 5, 6, Tr. 82.  Not only was there no reservation, but Mr. Coors testified on cross examination that:

> [Tr. 84] Q: Is it fair to say that at the time you wrote [Respondent's Exhibit 9] there had been no decision made as to how the lands in [Lot] B – or [Lots] D and F would or would not be irrigated in the future after the granting of the permit which was ultimately denied?
> A. Right. . . .

At Mr. Coors' urging and based on the representations made by him, on October 24, 1998, Mr. and Mrs. Andrews signed a

-3-

"disclaimer and quitclaim of water rights".  There was never a water right disclaimer and quitclaim executed by Mr. and Mrs. Padilla.

The Andrews predecessor in Lot F also signed a disclaimer and quitclaim, but Movants are unaware of the circumstances which gave rise to that document.

Mr. and Mrs. Andrews testified respecting the "disclaimer and quitclaims" that they executed and delivered the instruments because of the statements of Mr. Coors respecting his temporary need for those documents, which, he asserted, would be used to support a then-pending application at the State Engineer and his promise that he would convey them back to the Andrews when that process was finished.  Transcript, pp. 140-144. <u>See also</u> the affidavit of Mr. Coors, in which he explains or fails to explain) the purpose of the disclaimers and quitclaims:

> In order to clarify the ownership of all water rights, as shown on Exhibit 2, Henry G. Coors obtained Quitclaim Deeds and Disclaimers from the lot owners of all lots shown in the irrigated area of Exhibit 2. . . .  (Henry Coors affidavit in support of motion to set aside default.)

Mr. Coors never denied the assertions of both Mr. and Mrs. Andrews respecting his statements to them about his temporary need for the water rights in order to support his application at the State Engineer and his promise to reconvey the rights. Mr. Coors never performed any undertaking to return water rights, in any amount, to Mr. and Mrs. Andrews.  Instead he engaged in 5

-4-

pages of nonsensical testimony respecting hydrological calculations which he claimed the State Engineer should have made.  Tr. pp. 160-164.

Further incomprehensible testimony was given by Mr. Coors with respect to the Andrews' irrigation.  He stated that he told the Andrews they could irrigate their land "using [Mr. Coors'] water rights", Tr. 88, 89, because the water rights were "unaccounted for at that time", following a prior application to move the water rights away.  He stated that he told the Andrews they could irrigate their land, not because they had a water right to do so, Tr. 88, line 8, Tr. 89, lines 9, 10) but that they could just "go ahead and irrigate it."  (Tr. 89, line 12, 13.)

Mr. Coors does not deny the testimony of Mr. and Mrs. Andrews respecting his representations to them. I.e., that he said he wanted the disclaimer and quitclaim from them, so that he could inform the State Engineer about who the owner was, because as Coors testified, the Engineer does not adjudicate ownership. Tr. 86, line 11, et seq.  He does not deny that he stated he would reconvey the water rights to Mr. and Mrs. Andrews.  The Andrews believed him, and were induced by his representations to sign the disclaimers and quitclaims requested by him. Tr. 141.

The Andrews testified that Coors stated to them that the conveyance of the water right to Mr. Coors by the Andrews was

-5-

"temporary" and he would return ownership of the water rights to the Andrews and they would be in place on the Andrews' land; that the disclaimer and quitclaim was necessary so that he could secure for Rutheron a State Engineer permit for water additional to that which it already had. Tr. 86.  Mr. Coors assured the Andrews that they would have the water rights when the process was completed, they believed him and signed the disclaimer and quitclaim.  Tr. 143, 144.

Before the time the disclaimers and quitclaims were signed, the lot containing Mr. and Mrs. Andrews house and the lot owned by Padilla already had water service from Rutheron Mutual Domestic Water Association.  The water rights shown in the disclaimer they were signing were not necessary to provide water to their residence.  Tr. 142, line 24 through 143, line 2.

Mr. Coors never sought the permission of the Andrews to move the water rights away from the land which they owned.  Transcript p. 142, lines 14-16.

Instead of reconveying the water right to Mr. and Mrs. Andrews, on August 20, 2002, Coors executed a document which he called a water rights deed, Exhibit 13 to Coors Motion to Set Aside Default, to Rutheron.[1]  Mr. Coors testified that his intent was to convey to Rutheron all water rights he had left.  Tr. 113.

---

[1]See the letter in record herein of Peter Holzem, Esq.,  on behalf of the Rutheron Mutual Domestic Water Consumers' Association, showing that it makes no claim to the water rights.

See also Mr. Coors' contradictory testimony at Tr. 75, in which he states refers to his agreement, Respondents' Exhibit 4, and seems to agree that, as between Rutheron and Mr. Coors, "ownership of the water rights would remain in Henry Coors".

The water rights deed does not purport to convey to Rutheron the water rights appurtenant to any particular lands.  Instead it describes the lots in the subdivision and the family land division to which Mr. Coors wanted household water delivered by Rutheron.  The water rights deed does not describe the move-from land.  It simply refers to ten acre feet of consumptive use from State Engineer permit No. 1545-1699 water.  Mr. Coors could not describe the land from which the water rights had been moved. Tr. 71-74.

State Engineer Permit No. 1545-1699 is the permit for the Willow Creek Mesa ditch, pursuant to which several hundred irrigators take water to irrigate about 1500 acres of land. See the Hydrographic Survey Report on file herein.   At most, Mr. Coors never owned more than 34 acres irrigated pursuant to that permit.

Because of the failure of the water rights deed to identify or enable one to determine the location of the surface estate to which the water rights are appurtenant, the water rights deed to Rutheron would not have created any estate in Rutheron, even if that association had not disclaimed the water rights.

-7-

There is no "disclaimer" with respect to the water rights appurtenant to Mr. Padilla's Lot C, and Respondents believe there is no further issue with respect to those water rights or the standing of Mr. Padilla to make the claims he makes.

The question of the effectiveness of the Water Rights Deed was one of the questions of law to be addressed on the hearing of this matter but, because Rutheron did not appear or make any claim to the water right, but to the contrary has stated to the Court that it makes no claim of interest in the water right, that question may now be moot.  The bottom line is that Mr. Coors makes no claim to the right, believing, rightly or mistakenly, that he conveyed it to Rutheron; Rutheron makes no claim to it. In any event the doctrine of equitable estoppel, as discussed infra, prevents Mr. Coors from relying on the disclaimer and quitclaim.

With respect to his claim of excusable neglect in connection with the default against him, and the ensuing motion to set aside, as well as the claim for sanctions under Rule 11, Mr. Coors asserts that his neglect was excusable and that he was truthful in his statements to the Court.  The following facts and time line should be considered: the Court's notice of the various requirements to Mr. Coors, and the State Engineer's notice of the denial of Mr. Coors' application were mailed on to the address given by Mr. Coors (see the waiver of service of summons herein,

-8-

Document No. 6837) in Livingston, Texas.  The administrative denial of the permit, which Mr. Coors claimed had been granted, was sent by the State Engineer by certified mail on January 25, 2005 to the same address which had been given by Mr. Coors both to the State Engineer and to this Court.  The State Engineer's notice of denial was delivered to that address on February 7, 2005.  It was forwarded and received by him and he opened it on February 25, 2005.  Tr. 96, 98.

At that time there remained 12 days in which he could have timely filed his aggrieval with the State Engineer. He did nothing until March 10, 2005, when he sent a letter which was received on March 11, 2005, by the State Engineer's Hearing Unit. See Exhibit 3 to Respondents' motion for Rule 11 Sanctions.  The letter was both sent and received after the State Engineer's action became final by virtue of the absence of a timely notice of aggrieval.

The State Engineer application was returned to Mr. Coors stamped with large letters "DENIED" on each page.  See Exhibit 1 to Respondents' motion for Rule 11 Santions.  The certified letter giving notice of the denial clearly informed Mr. Coors of the time limits in which he could file an aggrieval, and of the means by which he might do so.

Mr. Coors knew the application had been denied, by virtue of the communications from the State Engineer, and as shown by his

-9-

failed attempt to request a hearing.

Irrespective of his untimely request for hearing, and even if it had been timely, nonetheless his representation to the Court that:

> 6. After a hearing from before (sic) the State Engineer, Petitioner was allowed to transfer 10 acre feet to the Rutheron Water Association and Petitioner executed and recorded a deed for said 10 acre feet of water rights to the Rutheron Water Association . . . (Coors Motion to set aside default judgment, Docket No. 7901)

was patently untrue, since to his knowledge, his application had been denied and he was <u>not</u> allowed to transfer 10 acre feet to Rutheron.

Mr. Coors had, over the years, attempted to change some of the irrigation water rights appurtenant to the original acreage purchased by him to other purposes.  He applied, beginning in 1993, to modify some of those water rights to allow their use by Rutheron in providing water to his subdivision. None of the water rights transferred in this early series of applications involved the water rights appurtenant to the land sold to Andrews or Padilla.  Indeed, it is impossible to determine what he intended to dry up in order to accomplish his purpose of giving water rights to Rutheron, because he never said what acreage he would dry up.  The problem he caused is reflected in Ms. Singer's testimony at Transcript pp. 128-129 and 135:

> 128, line 4:
> Q. And at the time, 2002, were there questions that came up on where the location was of Mr. Coors' water

rights?

A. Yes. Part of the problem was that the previous
[permit] conditions of approval, that Mr. Coors identify two
areas where water rights had been severed[,] had never been
met.   * * *
129, line 1:

A. We were trying to identify where on the hydrographic
survey map we should map the water rights that had been
retired and where the water rights still remained that were
irrigated.

Q. And when you're speaking about water rights that
were retired, can you tell us exactly what were those
retired water rights that you were concerned with?

A. . . . the real debate was . . . where was the
small amount of acreage that remained going to be mapped.
   * * *
p. 130, line 2:

[A.] . . . I recall mostly talking to Mr. Coors about
where to leave the water rights that were going to be
irrigated.  And I remember that his concern was that they be
spread across several lots.

Q. And what was the general area where these water
rights would be located?

A. Toward the north of the area. . . .
P. 135, line 17:

Q. . . . 7.3 acres was the part that hadn't been
allotted out to the various grantings and permits; isn't
that correct?

A. To the best of my recollection, that's right.

In the normal State Engineer administrative process which
results in a license a permit is issued, sometimes with
conditions of approval.  Either by condition of approval or
pursuant to statute, the permittee is required to show the land
dried up as a result of his transfer application, and the land to
which the water right is moved.  He secures his license by
proving his application of water to beneficial use. Coors never
did so.  Under Sun Vineyards, supra, the water right is
appurtenant to the Andrews property and is owned by them.

-11-

Andrews never consented to the water right being moved away. Tr. 142. Consent is required: 72-5-23:

> . . . . by and with the consent of the owner of the land, all or any part of the right may be severed from the land, simultaneously transferred and become appurtenant to other land, or may be transferred for other purposes . . . .

Mr. Coors specifically testified that he did not intend the water rights to come from any specific portion of the irrigated land, and in addition failed of declined to provide a plat of the land from which the water rights had previously been removed.  It is submitted the water rights deed means nothing insofar as the Andrews are concerned, and even less with respect to Mr. Padilla.

<u>Issues</u>:

1. Do the water rights remain appurtenant to the lands purchased from Coors by Mr. and Mrs. Andrews and by Mr. and Mrs. Padilla? (Mrs. Padilla is now deceased.)

2.  Do Mr., Mrs. Andrews and Mr. Padilla have standing to assert that they own or are proper claimants of the water rights appurtenant to the land.

3. Does Mr. Coors have any water rights?

4. Does Mr. Coors have standing to be a party to the adjudication, having retired, conveyed away or claiming to have conveyed away more water rights than he ever had.

5. Should the default against Mr. Coors be set aside by virtue of excusable neglect or other ground on which the default might be set aside?

-12-

6. Should Mr. Coors be sanctioned under Rule 16 for failure to participate in the scheduling process?  Yes, since his failure to participate led directly to several years of possibly unnecessary litigation, including large amounts of pleadings, briefing, trial-like hearings by the Special Master, and opinions by the Court.

7. Should Mr. Coors be sanctioned under Rule 11 for making knowingly false statements to the Court? Yes.  His statements were patently false.  He should not be permitted to behave in such fashion before this or any court.

<u>Resolution</u>:

1. The water rights remain appurtenant to the lands purchased from Coors by Mr. and Mrs. Andrews and by Mr. and Mrs. Padilla.

In the case of Mr. Padilla, his ownership and claim is clear, unambiguous and unmuddied by the disclaimer and quitclaim documents which affect all the other lots in the subdivision.

NMSA Section 72-1-2 (1907) provides:

* * * all waters appropriated for irrigation purposes, except as otherwise provided by written contract between the owner of the land and the owner of any ditch, reservoir or other works for the storage or conveyance of water, shall be appurtenant to specified lands owned by the person, firm or corporation having the right to use the water, so long as the water can be beneficially used thereon, or until the severance of such right from the land in the manner hereinafter provided in this article. . . .

In addition, Section 72-5-23 provides:

All water used in this state for irrigation purposes, except
as otherwise provided in this article, shall be considered
appurtenant to the land upon which it is used, and the right
to use it upon the land shall never be severed from the land
without the consent of the owner of the land, but, by and
with the consent of the owner of the land, all or any part
of the right may be severed from the land, simultaneously
transferred and become appurtenant to other land, or may be
transferred for other purposes . . . on the approval of **an
application of the owner** by the state engineer.  Publication
of notice of application, opportunity for the filing of
objection or protests and a hearing on the application shall
be provided as required by Sections 72-5-4 and 72-5-5 NMSA
1978.  (Bold added.)

See also <u>KRM v. Caviness</u>, 1996-NMCA-103, 122 N.M. 389, 925 P.2d

(1996), noting the real property characteristics of irrigation

water rights.

It is important to note, under Section 72-5-23, <u>supra</u>, that

at the time of the Coors application he was not the owner of the

rights.

Equitable estoppel has been rtreated by the New Mexico

courts at length.  The elements of equitable estoppel were

defined in <u>Westerman v. City of Carlsbad</u>, 55 N.M. 550, 555, 556,

237 P.2d 356, 359 (1951) and in cases following it as follows:

The essential elements of an equitable estoppel as related
to the party estopped are: (1) Conduct which amounts to a
false representation or concealment of material facts, or at
least, which is calculated to convey the impression that the
facts are otherwise than, and inconsistent with, those which
the party subsequently attempts to assert; (2) intention, or
at least expectation, that such conduct shall be acted upon
by the other party; (3) knowledge, actual or constructive,
of the real facts. As related to the party claiming the
estoppel, they are: (1) Lack of knowledge and of the means
of knowledge of the truth as to the facts in question; (2)
reliance upon the conduct of the party estopped; and (3)
action based thereon of such a character as to change his

position prejudicially. <u>National Adv. Co. v. State ex Rel. New Mexico State Hwy. Comm'n</u>, 91 N.M. 191, 571 P.2d 1194 (S. Ct. 1977)

The property characteristics of irrigation water rights means that their conveyance can be accomplished only in the manner required for real property conveyances, as embellished by the specific requirements of the water rights statutes.

The general rule of descriptions necessary to effectively convey real property is that:

> The purpose of a description of the land, which is the subject matter of a deed of conveyance, is to identify such subject matter; and it may be laid down as a broad general principle that a deed will not be declared void for uncertainty in description if it is possible by any reasonable rules of construction to ascertain from the description, aided by extrinsic evidence, which property is intended to be conveyed. It is sufficient if the description in the deed or conveyance furnishes a means of identification of the land or by which the property conveyed can be located.... So, if a surveyor with the deed before him can, with the aid of extrinsic evidence if necessary, locate the land and establish its boundaries, the description therein is sufficient. <u>Romero v. Garcia</u>, 89 N.M. 1, 546 P.2d 66 (S. Ct. 1976).

The water rights deed executed by Coors here only leads the reader to some 1500 acres of irrigated land, of which Coors only owned about 30. The description he gave does not furnish any means of identification of the water right land.

> if the description in the instrument relied upon as color of title does not identify the land with the degree of certainty essential to ascertain its boundaries, it lacks an essential of color of title. Even though a void tax deed might otherwise constitute color of title, it cannot do so if the description of the land is insufficient to locate or identify it, and cannot be made sufficient. <u>Sanchez v. Garcia</u>, 72 N.M. 406, 384 P.2d 681 (S. Ct. 1963).

-15-

The water rights portion of this case is principally governed by two decisions of the New Mexico Supreme Court: <u>Turner v. Bassett</u>, 2005-NMSC-009, 111 P.3d 701 (2005), and <u>Sun Vineyards, Inc. v. Luna County Wine Dev. Corp.</u>, 107 NM 524, 760 P.2d 1290 (S. Ct. 1988).

The ruling in <u>Turner/Bassett</u> was that a State Engineer permit to change location of "water usage" creates a rebuttable presumption that the water rights have been severed from their prior place of use, are no longer appurtenant thereto, and therefore did not accompany the conveyance of the title of the move-from lands.  The issue here, of course, is the obverse, and Andrews and Padilla assert that there is no permit to change the location of the water usage here at issue, and the water rights are still appurtenant to the land which they purchased.

The facts in <u>Turner/Bassett</u> were that the seller of land had secured a permit from the State Engineer to phase out his irrigation and institute municipal-industrial type uses with his water.  The permit set forth time limits for accomplishing the new uses.  Those time limits were extended from time to time. The permit was in good standing at the time of the sale of the "move-from" land to Mr. Turner.  No mention of the application and permit to move the water rights away was made to Mr. Turner (who, in any event, knew the facts.)  The Supreme Court held that the permit issued by the State Engineer and the cessation of

-16-

irrigation at the move-from land were the significant factors in the creation of a presumption of severance.

The buyer, Turner, asserted that under a previous decision of the NM Supreme Court, Sun Vineyards, supra, the conveyance of the move-from lands pursuant to permit but prior to issuance of the State Engineer's license for the changed water right terminated the severance process and left the water right appurtenant to the move-from lands.  The Supreme Court held that because the permit from the State Engineer was in good standing and the conditions of the permit were being complied with by Bassett, the severance process was not terminated as it had been in Sun Vineyards.

Here there has been no permit and hence there is no presumption, rebuttable or otherwise, of the severance of the water from the land sold by Coors to Padilla/Andrews.  Instead the application has been denied.  Mr. Coors, a member of the bar of this Court[2], seems to have recognized that existence of a permit is crucial to his case, since he falsely asserted that he had a permit from the State Engineer in support of his motion to set aside the default judgment which had been entered against him.

Mr. Coors further falsely stated that when he was aggrieved

_____

[2]Now on inactive status, according to the New Mexico Directory of the Bench and Bar, but who was, at the time the events at issue herein occurred, an active member of the bar.

by the State Engineer's denial of his application, he timely filed a request for hearing with the State Engineer.  The notice of the denial was served on him by certified mail and was received by his mail service on February 7, 2005.  The time for him to request a hearing expired on March 9, 2005.  <u>See</u> NMSA 1978 Section 72-2-16 (1973).  He mailed his request for a hearing on March 10, 2005, and it was received by the State Engineer on March 11, 2005.  It was too late, and the Engineer's decision became final at the close of business on March 9. NMSA Section 72-2-16 (1973) provides:

> . . . . If, without holding a hearing, the state engineer enters a decision, acts or refuses to act, any person aggrieved by the decision, act or refusal to act, is entitled to a hearing, **if a request for a hearing is made in writing within thirty days after receipt by certified mail of notice of the decision, act or refusal to act**. . . . (Bold added.)

The uncontroverted evidence is that the notice of the State Engineer's decision, made without holding a hearing, was delivered and received by Mr. Coors' designated agent on February 7.  He asserts that the agent did not get it to him until February 25, and so he should have until March 25 rather than March 9.  The language of the statute and the facts dictate to the contrary.  At the time Mr. Coors received the notice of the Engineer's action he could even then have timely made a demand for hearing to the State Engineer or a continuance of time in which to do so.  Instead he did nothing.

2.   Mr., Mrs. Andrews and Mr. Padilla have standing to
assert that they own or are proper claimants of the water rights
appurtenant to the land.

Standing: standing is defined as "a party's right to make a
legal claim or seek judicial enforcement of a duty or right."
Black's Law Dictionary, 7ᵗʰ ed.

> Have the appellants alleged such a personal stake in the
> outcome of the controversy as to assure that concrete
> adverseness which sharpens the presentation of issues upon
> which the court so largely depends for illumination of
> difficult constitutional questions?  This is gist of the
> question of standing.  Baker v. Carr, 369 U.S. 186 (1962).

I.e., do the Respondents have some legal claim to the water
rights that they can seek judicial enforcement of their rights?

It is clears that Mr. Padilla has such a claim.  He acquired
the water rights, and no document or other device has been shown
which could under any circumstance deprive him of it.

Mr. and Mrs. Andrews are in the same situation with one
difference: they signed a "disclaimer and quitclaim".  They claim
the disclaimer and quitclaim was signed as a result of the false
representations of Mr. Coors, and the false pretenses for the
"disclaimer and quitclaim" give them an enforceable right to have
the water rights in their ownership.   Since this Court is only
concerned with standing to be claimants of the water rights, and
not with the ultimate outcome of the title issues, Mr. and Mrs.
Andrews point to Everett v. Gilliland, 47 N.M. 269, 141 P.2d 326
(S. Ct. 1943), as authority for the proposition that they have a

-19-

claim of fraud in the inducement.  To the extent the quitclaim and disclaimer was facially effective to take their property right in the water from them, they have the right to assert their opposing claim and to protect their interest in the water right by participation in this statutory water right adjudication action.

An important factor in determining standing is the statute creating the cause of action before the Court.  The applicable sections are N.M.S.A. Sections 72-4-13 through 72-4-19, (1982).  For purposes of determining standing the first inquiry is 72-4-17, which, in part, provides:

> In any suit for the determination of a right to use the waters of any stream system, all those whose claim to the use of such waters are of record and all other claimants, so far as they can be ascertained, with reasonable diligence, shall be made parties. . . . and all unknown persons who may claim any interest or right to the use of the waters of any such system . . . may be made parties in such suit . . . and . . . unknown persons by the name and style of unknown claimants of interest to water in such stream system, and service of process on, and notice of such suit, against such parties may be made as in other cases by publication.

It is obvious that Mr. and Mrs. Andrews have a claim to the water rights.  Under <u>Santistevan v. Centinel Bank</u>, 96 N.M. 730, 634 P.2d 1282 (S. Ct. 1981), are they the "owner[s] of the property and thus . . . real part[ies] in interest"?  I.e., are they the owners of the property, or persons entitled to make claims which if sustained will render them the owners of the property free from the cloud created by the disclaimer/quitclaim?

-20-

The Supreme Court's language in <u>Bassett</u>, <u>supra</u>, ¶ {20} is apropos here:

> In order to effect a severance [from the move-from land], Section 72-5-23 requires consent of the landowner, and "approval of an application" by the State Engineer.

As noted above, the application can only e made by the owner. If the Disclaimer/Quitclaim was ever effective, it was only effective after the application was filed.

Contrary to the facts in <u>Bassett</u> neither consent of the landowner nor approval of the State Engineer are present in this case. The Supreme Court noted that:

> the active review of an application by the State Engineer occurs during the permitting phase of the process. The proposed severance is evaluated by the State Engineer to determine whether the changed use of water may result in adverse impacts to other appropriators or may be detrimental to water conservation and the public welfare. Protests and objections are also submitted at this initial point in the process.

As is obvious in the present case, the "active review" never took place because the permit had been denied. Mr. Coors had defaulted in the adjudication action. He defaulted because he thought he had conveyed the water rights to Rutheron and no longer had any interest in the water rights.

Even if the disclaimer and quitclaim were not tainted with the issues of fraud as they are, there is not even a whisper of evidence that Mr. and Mrs. Andrews, who were by then the owners of both lots, had given their consent to the removal of the water

rights.   See the language of Bassett, supra, in which the
governing statute, Section 72-5-23, was cited by the Supreme
Court:

> All water used in this state for irrigation purposes,
> except as otherwise provided in this article, shall be
> considered appurtenant to the land upon which it is used,
> and the right to use it upon the land shall never be
> severed from the land without the consent of the owner of
> the land, but, by and with the consent of the owner of the
> land, all or any part of the right may be severed from the
> land, simultaneously transferred and become appurtenant to
> other land, or may be transferred for other purposes

An important word in the statute, at least in this
context, is "simultaneously" .

3. Mr. Coors owns no water rights at Fort Heron Preserve.
Once the conveyance to the Padillas is taken into account, there
did not remain sufficient water rights for Mr. Coors to make the
full conveyance to Rutheron.  Hence his argument that he withheld
from the sales to Padilla and Andrews the water rights so he
could make a transfer of them to Rutheron, and that there would
be enough water rights for him to do so, and give water rights
back to the Andrews, is defeated.  At the very strongest, his
argument shows that he has no water rights which serve to give
him standing.

4. Mr. Coors no longer has standing to be a party to the
adjudication, having retired, conveyed away or claiming to have
conveyed away more water rights than he ever had.  See the
argument made at the end of Point 3, above.

-22-

5. The default against Mr. Coors should not be set aside, there having been no excusable neglect for which the default might be set aside.  Mr. Coors makes the circular argument that he acted diligently in dealing with the Court's requirements of attending the scheduling conference and the subsequent status conference by his showing that even though notices, both of this Court's settings and of the State Engineer action, were sent to the address he provided, that he did not receive those notices for an unexplained reason.  He makes no claim that the mailed items were not received at the address he gave.  Those items which were mailed by certified mail were clearly received, since his agent signed for them and forwarded them to him.  The issue is really whether he can simply stop the processes of the United States District Court by having a less than effective means of having his mail forwarded to him.  Respondents submit that he cannot.  This is not an unsophisticated litigant who might be excused by being in the dark about the mysteries of federal court procedures and requirements, but a lawyer who knows better.  His address is his address.  He gave it to the Court and the other parties.  He is bound by it.  It was not necessary that he use the Livingston, Texas, address, as demonstrated by the fact that other mail sent to him at the many addresses he maintained somehow managed to get through to him.  See Respondents Exhibits 1, 2, 3.

6. Mr. Coors should be sanctioned under Rule 16 for failure to participate in the scheduling conference, because his failure to participate led directly to several years of possibly unnecessary litigation, including large amounts of pleadings, briefing, trial-like hearings by the Special Master, and opinions by the Court.  Most important they led to huge expenses on the part of Respondents.  If he had simply shown up and asserted his position, Respondents could have intelligently weighed the costs and benefits of pursuing the water rights.  They could not do so in the absence of Mr. Coors.  As a result, they took step after step, never knowing what Mr. Coors' position was.  The result is that by now, their expenses are likely to be more than the water rights are worth.

7. Mr. Coors should be sanctioned under Rule 11 for making knowingly false statements to the Court.   His statements were patently false.  He should not be permitted to behave in such fashion before this or any court.

                          RESPECTFULLY SUBMITTED:

                          PETER B. SHOENFELD, P.A.
                          P.O. Box 2421
                          Santa Fe, New Mexico 87504-2421
                          (505) 982-3566; FAX: (505) 982-5520

                          By:Peter B. Shoenfeld (efiled)
                          Attorney for Respondents


                     CERTIFICATE OF SERVICE

I certify that on January 17, 2005, I served a copy of the

-24-

foregoing instrument on the following by first class mail.

Walter L. Reardon, Jr.
3733 Eubank Blvd., N.E.
Albuquerque, NM 87111-3536

Ed Newville, Special Assistant
Attorney General
State Engineer Office
P.O. Box 25102
Santa Fe, New Mexico 87504-5102


  Peter B. Shoenfeld (e-filed)  
Attorney for Respondents Andrews,
and Padilla