IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

STATE OF NEW MEXICO on the           )
relation of State Engineer,          )
                                     )
                  Plaintiff,         )
                                     )      69cv07941-BB
      -v-                            )
                                     )      RIO CHAMA STREAM SYSTEM
ROMAN ARAGON et al.,                 )
                                     )
                  Defendants.        )      Section 1 - Mainstream
_____)

SPECIAL MASTER'S REPORT ON PRIORITIES FOR THREE ACEQUIAS

To:  The Honorable Bruce B. Black            From:  Vickie L. Gabin
     District Judge                                 Special Master

       This Report recommends that the Court find no abandonment of water rights by the original settlers in the areas of the current day Acequias de Chamita, Hernandez and Los Salazares, and that the first use of water was 1600.

THIS MATTER is before the Special Master pursuant to Fed. R. Civ. P. 53, and reports findings of fact and conclusions of law following evidentiary hearings held August 14, 15, 16 and 19, 1996. These hearings were the culmination of the State's efforts to complete the adjudication of water rights priorities in the Mainstream Section of the Rio Chama Stream System. *See, e.g.,* Amended Order on the Adjudication of Water Right Priorities (July 8, 1994). Priority dates for three mainstream acequias - the Acequias de Chamita, Hernandez, and Los Salazares - were at issue. The parties were the State of New Mexico, *ex rel.* State Engineer ("State"), the Acequias mentioned above and several individual water rights claimants on those acequias (collectively, "the Acequias").

The pleadings and exhibits I reviewed are listed following the body of this Report in Appendices

I and II.

In summary, the Acequias claim that their priorities precede the Pueblo Indian revolt of 1680, and relate back to the time of the original settlements in the area, 1598 - 1600.   The State asserts that there is insufficient proof that the settlers continuously irrigated the areas, even taking into account excusable periods of non-irrigation; consequently, the appropriate priority is 1714, when the Spanish first resettled the area after 1680.

Both parties introduced a wealth of historical information through two accomplished historians, Dr. John O. Baxter (at that time, the Court's expert witness), and Dr. Stanley M. Hordes. Additionally, the Acequias' evidence included the geomorphic features in the area of the three acequias through Mr. Jay Lazarus and ethnohistorical evidence through Dr. Frances Levine.   Mr. Antonio Garcia, Mr. Richard M. Salazar, Mr. Joseph Michael Salazar, Mr. Juan Archuleta,  Mr. Henry Salazar, Mr. Fred Vigil and Mr. J. Richard  testified about the oral history  and traditions, archival research and genealogical links from the original colonists to present-day residents in the Rio Chama Valley.   Mr. A. Samuel Adelo, J.D., testified regarding the translations of certain Spanish words in the documentary record and common usages.

Some of this evidence provided a context for better understanding the colonial period generally.   I have not adopted  findings based on this evidence, or other evidence which did not directly support the parties' positions and arguments regarding the central issue of abandonment.  The findings stated below are limited to those which are most directly pertinent to the issue before the Court:  were the original settlements abandoned, and irrigation efforts terminated, between 1608 and the post-Pueblo Revolt period of resettlement, beginning in 1714.

**I.  STIPULATED FACTS**

The following stipulated facts were agreed upon by Dr. Baxter and Dr. Hordes, and adopted by the Court (Order, November 17, 1995, Doc. No. 4380).

1. In 1598 Juan de Oñate led a large expedition out of San Bartolomé in present Chihuahua to establish a permanent settlement in New Mexico. In this endeavor he was accompanied by 10 Franciscan friars and 129 citizen-soldiers and their families.

2. The Oñate expedition arrived at present San Juan Pueblo[1] on July 11, 1598.

3. With the assistance of 1,500 Pueblo Indians, Oñate initiated a project to build an acequia on the east bank of the Río Grande.

4. In 1600 Spanish settlers moved to a new settlement across the Río Grande to a location directly west of the Pueblo of San Juan, north of the Río Chama, at the partially abandoned Pueblo of Yuque-Yunque, which the Spanish authorities named "San Gabriel".

5. The Spanish settlers promptly established an irrigation system at San Gabriel, constructing an acequia taken from the waters of the Río Chama. This acequia irrigated wheat, barley, corn and other garden crops. San Gabriel was located in the area now known as Chamita.

6. About 1608, some Spanish settlers left San Gabriel and relocated at the present site of Santa Fe.

7. The Pueblo Revolt of 1680 resulted in the destruction of virtually all of the locally-generated records in New Mexico from the founding of Santa Fe to 1680. It is thus impossible to determine how many Spanish settlers remained at San Gabriel after 1608, or the nature and extent of Spanish settlement at San Gabriel through the 17th Century based on contemporary documentation.

---

[1] The Pueblo of San Juan is now known as Ohkay Owingeh. This report, however, will refer to the Pueblo by its previous name to avoid confusion.

8.  In 1714 Antonio de Salazar received a grant of land in an area that is irrigated today by the Salazar acequia on the south bank of the Río Chama and the west bank of the Río Grande, near their confluence.

9.  In his petition to Governor Juan Ignacio Flores Mogollón, Salazar indicated that his great-grandfather, Alonso Martín Barba, had owned these lands prior to the Pueblo Revolt of 1680. Salazar also requested the same access to farmlands that Martín Barba has used.

## II.  FINDINGS OF FACT

A.  <u>Documentary Evidence</u>

1.  Sometime between the end of 1599 and early 1600, the colonizers moved to the West side of th Rio Grande to a place called Yunque Pueblo, also called San Gabriel de Yunque.  Baxter, Tr. Vol. 1 at 36; Hordes Report at 3.

2.  The Enrico Martinez Map of 1602 shows the settlement of San Gabriel to include the area south of the Rio Chama, near the confluence with the Rio Grande; the lands irrigated by the Salazar and Hernandez acequias.  Def. Exh. Q.

3.  In an account published in 1615, Juan de Torquemada described the acequia and the crops grown at San Gabriel at a point some time between 1612 and 1615.   The colonizers were also getting some of their food from surrounding Pueblos.  Baxter, Tr. Vol. 1 at 37, 48-49; Hordes, Tr. Vol. II at 280-82, 378; Hordes Report at 2 -3.

4.  Fray Juan de Torquemada's report, written at some point between 1612 and 1615, states that there were agricultural activities at San Gabriel on or before 1612.  Hordes, Tr. 281 - 82, 378; Def. Exh. E-1.

5.  Between the time of the founding of San Gabriel and the Pueblo Revolt, some colonizers

participated in exploratory expeditions with Don Juan Onate.  Others re-located to Santa Fe, which became the official capital in 1610.  Baxter, Tr. Vo. 1 at 44-45, 132.

6.  Due to the absence of many of the colonizers while they were on expeditions, Indian raids made farming difficult and decimated the livestock.   The diminished population and relatively isolated location made San Gabriel vulnerable to Indian raids.  Baxter, Tr. Vol. 1 at 43, 50.

7.  While the capital was being moved from San Gabriel to Santa Fe in 1608, Juan Martinez de Montoya reported that he was building a new house at San Gabriel.  Baxter, Tr. Vol. 1 at 131; Hordes, Tr. Vol. III at 282-3; 385-87; Hordes Report at 4.

8.  Fran Alonso de Benavides, a member of the Franciscan order in New Mexico, wrote a report on New Mexico in the 1620's.  The report did not mention San Gabriel.  Baxter, TR 61, 62; Plaintiff's Exh. 3.

9.  In 1662, Francisco Gomez Robledo maintained an estancia at San Gabriel de Yunque which was owned before him by his father, Francisco Gomez.  Hordes, Tr. II at 283-84, Def. Exh. E-3.

10.  In 1712, Roque Madrid and other settlers petitioned for lands at the Villa de Yunque for the purpose of improving the existing "corrales de piedra."  Def. Exh. E1 at 9.

11.  In 1714 Cristobal Crespin petitioned for lands along the north bank of the Rio Chama. The petition included the statement that the existing acequia had been cleaned out in April, 1714. Def. Exh. T; Adelo, Tr. 410-413.

12.  The acequia named in the Crespin petition is the present-day Chamita Ditch.  There is no geomorphic or other evidence of an acequia other than the Acequia de Chamita that could have irrigated lands at San Gabriel.  Lazarus, Tr. Vol. II at 240- 9.

5

13.  The Hernandez Ditch and the Salazar Ditch are part of one continuous irrigation system which irrigates the floodplain that lies south of the Rio Chama and west of the Rio Grande.  Def. Exh. B.

14.  The Hernandez Ditch and the Salazar Ditch irrigate lands that were irrigated before the 1680 Pueblo Revolt by Alonso Martin Barba.  Hordes, TR Vo.    320-321.

15.  In 1695, Governor Diego de Vargas ordered his aide, Luis de Granillo, to make a reconnaissance of the general area of Santa Cruz in 1695.  Granillo described pre-Revolt haciendas in the Santa Cruz Valley and on the west bank of the Rio Grande north to the Rio Chama  as  he crossed ("pasando") the Rio Grande, or other rivers or arroyos.   Hordes, Tr. 302 - 304; Adelo, Tr 409 - 410, 415 - 418; Baxter, Tr. 158; Def. Exh. E p. 12.

16.  The descendants of the Oñate colonists and later pre-Revolt settlers that established themselves in the lower Rio Chama Valley returned to the area after the Revolt, and still live there today.  Hordes, Tr 323-4; Def. Exh. E, pp. 17 - 18.

   B.  Ethnohistorical and Genealogical Evidence

17.  Ethnohistory is a research discipline that combines historical documentary research with the anthropological study of communities; it  is especially valuable in New Mexico, where much of the documentary record was destroyed in 1680.  Ethnohistory links some of the pre-Pueblo Revolt families to later settlers and current residents.   Levine, Tr. 445 - 476.

18.  Oral interviews with community members in the Espanola Valley and documentary research corroborates the genealogical and geographical links between the original settlers and contemporary residents.  Levine, Tr. 461 - 469, 474.

19.  The genealogical research conducted by the historian and former state archivist, J.

Richard Salazar, who was raised in the Corral de Piedra area on the west side of the Rio Chama, and by Jose Fidel Trujillo, shows that both the Salazar and Trujillo families descend from Alonso Martin Barba, who, prior to 1680, held land near the confluence of the Rio Chama and Rio Grande.  Levine, Tr. 461 - 62; J. Richard Salazar, Tr. 600 - 601; J. F. Trujillo, Tr. 620-621.

20.   The Spanish word used to indicate the construction of a new acequia might be "abrir" (to open) or "hacer" ( to make).  Adelo, Tr. 412 - 413.

21.   In Spanish spoken in Northern New Mexico, the word "pasando" means to cross over. Adelo, Tr. 415 - 416.

## III. QUESTIONS TO BE DETERMINED

The questions to be determined are whether the State has shown by clear and convincing evidence that the 17th century colonizers abandoned the water rights initiated around 1600;  and, if abandonment has been shown, whether the Acequias have shown a reasonable excuse for having done so.

## IV. DISCUSSION

### A.   Abandonment

The law of abandonment in New Mexico requires the plaintiff to show that the owner of a right relinquished the right with the requisite intent to desert the right.  Reynolds v.  South Springs Co., 452 P.2d 478 (N.M. 1969).  Quoting with approval from Green Valley Ditch Co. v. Franz, 129 P. 1006, 1008 (Co. 1913), the Court stated:

> [I]ntent may be express or implied.  It may be effected by a plain declaration of an intention to abandon it; and it may be inferred from acts or failures to act so inconsistent with an intention to retain it that the unprejudiced mind is convinced of the renunciation.

<u>Id</u>., 481.

Where there is no express declaration or evidence of an intent to abandon the right, clear and convincing evidence of the non-use of water for an "unreasonable period" may raise a rebuttable presumption of an intent to abandon.  <u>Id</u>., 482.  In the adjudication of the Jemez River, this Court ruled that <u>South Springs</u> "establish[es] the rule that clear and convincing evidence of nonuse of water for an unreasonable period may raise a rebuttable presumption of an intent to abandon a water right and thereby shift the burden to the water right claimant to show excuse for nonuse." <u>State v. Abousleman</u>, 83cv1041 (D.N.M. February 7, 1994).  There,  the Court found that the failure to use water for 16 years may be sufficient to raise a rebuttable presumption of an intent to abandon a water right.  The burden then shifts to the claimant to present sufficient evidence of an excuse for the non-use. <u>Id</u>., 12.

Ten years, later, in a subfile dispute in this case, this Court emphasized the <u>South Springs</u> holding that non-use alone is insufficient to show an intent to abandon; both non-use and an intent to abandon must be present.  <u>State v. Aragon</u>, 69cv07941 (D.N.M.  February 9, 2004) (attempts by defendant over many years to repair her irrigation works, although ineffectual, indicated that she did not intend to abandon the water rights.) See, also, <u>Village of Wagon Mound v. The Mora Trust</u>, 62 P. 3d 1255 (N.M.C.A. 2002, *cert. den*. 2003) (intent to abandon is a required element of abandonment).

B.  <u>Standard of Proof</u>

Clear and convincing evidence "instantly tilt[s] the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." <u>In re Sedillo</u>, 498 P.2d 1353, 1355 (1972).   In civil cases generally, the

plaintiff satisfies the burden of persuasion by a clear and convincing (or similar standard) proof. *See*, Addington v. Texas, 441 US 418 (1979).

The State asserts that clear and convincing evidence demonstrates that the colonists ceased irrigating for nearly 100 years.  In support of this assertion, the State cites two sources: the 1620 report by Fray Benavides, which makes no mention of San Gabriel, giving rise to the inference that it was no longer a viable settlement; and the report written by Fray Juan de Torquemada between 1612 and 1615, which makes no mention of agricultural activity after 1612.   Additional findings suggest that the population in the San Gabriel area fluctuated as a consequence of a variety of factors:  the establishment of Santa Fe in 1608; the continuing, wide-ranging explorations by Onate and some of the colonizers;  and Indian depredations.    The State then concludes that documents suggesting that the colonists received lands  in 1714 constitute  the only "reliable and credible evidence of the first, unabandoned irrigation efforts in the area."   State's Brief at 8.

Evaluating a case where the facts relate to irrigation and settlement patterns over 400 years old is challenging, at the very least.   "Clear and convincing," or even the lesser standard of "preponderance of the evidence" are standards which do not lend themselves to ready application in this case.  One court has found that it would be "overly burdensome and unrealistic" to require "unquestionable, overwhelmingly clear evidence" of a pre-1903 water use in 1991 [emphasis supplied].  Eskelson v. Town of Perry, 819 P.2d 770, 774 (Utah 1991).   It is tempting to use Eskelson for the basis of a declaration that New Mexico's extraordinary colonial history prevents the fact finder from finding very many facts with any degree of certainty.  I feel, however, constrained to work within the bounds of existing case law and the State's chosen legal analysis of the doctrine of abandonment as applied to their evidence.

While the State's evidence may be "reliable and credible," I disagree that it rises to the level of "clear and convincing."   In fact, no evidence introduced by either party during these hearings allows the fact finder to construct very much more than plausible inferences.   But the burden of proving abandonment is the State's, and the State has failed to meet that burden.   Because I reach this conclusion, I have not included herein consideration of the Acequias' evidence or arguments having to do with possible excuses for non-use, or the historical and cultural importance of determining pre-1680 priority dates for the areas in question.  I have relied on the documentary evidence and the parties' stipulated facts to conclude that the first use of water by the three ditches is 1600.

## V.  CONCLUSIONS OF LAW

1.  The State has failed to show abandonment by clear and convincing evidence with regard to :  a.  the existence of a period of non-use between 1608 and 1714; and b.  the settlers' intent, either express or implied, to abandon the lands irrigated by water diversion structures which are substantially the present-day Acequias de Chamita, Hernandez and Los Salazares.

2.  The evidence supports a 1600 priority date for the Acequias de Chamita, Hernandez and Los Salazares.

## VI.  RECOMMENDATIONS

I recommend:

1.  the Court find that the water rights initiated by the first Spanish settlers in the area of the Acequias de Chamita, Hernandez and Los Salazares were not abandoned; and

2.  the Court find that 1600 is an appropriate water right priority for those acequias.

Respectfully submitted,

_____
SPECIAL MASTER

APPENDIX I:   PLEADINGS

1.      Order Adopting Stipulation, and Stipulation Agreed to by Dr. Stanley Hordes and Dr. John Baxter (November 17, 1995, Doc. No. 4380)

3.      New Mexico's Requested Findings of Fact and Conclusions of Law on the Priority Dates of Certain Community Acequias (April 3, 1997, Doc. No. 5628)

3.      State of New Mexico's Memorandum Brief in Support of its Requested Findings of Fact and Conclusions of Law on the priority Dates of Certain Community Acequias (April 3, 1997, Doc No. 5629)

4.      Acequias' Requested Findings of Fact and Conclusions of Law Regarding Priority Dates (April 2, 1997, Doc. No. 5626)

5.      Acequias' Brief in Support of Requested Findings of Fact and Conclusions of Law Regarding      Priority Dates (April 2, 1997, Doc. No. 5627)

APPENDIX II:  EXHIBITS

Note:  Exhibits are included with pleadings in the physical docket located at the U.S.D.Ct. Albuquerque

Plaintiff's Exhibits

1.  Worcester, Donald E., "The Navajo During the Spanish Regime in New Mexico,"  New Mexico Historical Review, Vol. 26, No. 2

2. Scholes, France V., "Civil Government and Society in New Mexico in the Seventeenth Century," New Mexico Historical Review, Vol. 10, No. 2

3.  The Memorial of Fray Alonso de Benavides, 1630

4.   Maps indicating settlements cited by Granillo

5.  Spanish Archives of New Mexico I, No. 882

6.  Spanish Archives of New Mexico I, No. 311

7.  Spanish Archives of New Mexico I, No. 400

8.  Spanish Archives of New Mexico I, No. 293

9.  Excerpt from Twitchell, Ralph Emerson, The Spanish Archives of New Mexico Vol. I

10.  Excerpt from Court of Private Land Claims, Case No. 194

11.  Spanish Archives of New Mexico I, No. 932

12.  Spanish Archives of New Mexico I, No. 828

13.  Spanish Archives of New Mexico I, No. 823

14.  Partial translation, Spanish Archives of New Mexico I, No. 818

15.  Baxter, John O., Report:  Irrigation in the Chama Valley

16.  Spanish Archives of New Mexico I, No. 289

17.  Spanish Archives of New Mexico, Borego-Ortega papers

18.  Spanish Archives I, No. 413

19.  Spanish Archives of New Mexico I, No. 437

Defendant's Exhibits

A.  Stipulation agreed to by Dr. Baxter and Dr. Hordes

B.  Map of the area of the acequias

C.  John Kessell Affidavit

D.  Dictionary definition of "sacar"

E.  Hordes, Stanley, Report:  Irrigation at the Confluence of the Rio Grande and Rio Chama:  The Acequias de Chamita, Salazar and Hernandez, 1600-1680 (and exhibits contained therein)

F.  Dictionary definition of "hacer"

G.  Dictionary definition of "abrir"

H.  Glorieta Geoscience, Inc. Statement of Qualifications

I.  Glorieta Geoscience Letter Report

J-1.  Topographic map of San Juan Pueblo quadrangle

J-2.  Topographic map of Chili quadrangle

K.  High altitude photograph of area

L.  High altitude photograph of area

M., N., O.  Photographs of field investigations

P.  Hordes, Dr. Stanley M., Curriculum Vitae

Q.  1602 archival map of  New Mexico

R.  Excerpt from Don Juan de Onate, Colonizer of New Mexico, 1595 - 1628, by George P. Hammond and Agapito Rey

S.  Spanish Archives of New Mexico I, 167

T.  English translation of No. S, above

U.  Bloom, Lansing B., "When was Santa Fe Founded?,"n New Mexico Historical Review, Vol. 9, 1929

V.  Document from the Biblioteca Nacional de Mexico

W. Document from the Biblioteca National de Mexico

X.  Dictionary definition of "despoblar"

Y.  Dictionary definition of  "despoblarse el lugar"

Z.  Excerpt from Historical Documents relating to New Mexico, Nueva Vizcaya, and Approaches Thereto, to 1773, collected by Adolph F.A. Bandelet and Fanny R. Bandelet

AA.  Adelo, Samuel A., Biographical Information

BB.  Hordes Report, p. 14

CC.  Dictionary definition of "pacer"

DD.  Levine, Dr. Frances, Curriculum Vitae

EE.  Levine, Dr. Frances, Report:  Local Perspectives:  A Case Study from the Rio Chama Water Rights Adjudication, Summer 1996

FF.  Temporary Restraining Order, United States v. Manda, No. 735, Equity (May 16, 1921)

GG.  Order of Dismissal, United States v. Manda, No. 735, Equity (June 6, 1932)

HH.  Martinez, Elmer, "Salazar, Orients Escaroles,"  A Heraldic Research Report