IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

STATE OF NEW MEXICO ex rel.
STATE ENGINEER,

          Plaintiff,

vs.                                                          CIVIL NO. 69-7941 MV/LFG

ROMAN ARAGON, et al.,                      RIO CHAMA ADJUDICATION

          Defendants.

## MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDED DISPOSITION[1]

### Findings

1.     On December 19, 2011, Defendants David M. Ortiz and Cecilia S. Ortiz filed a one-page objection to the priority date proposed for their water right.  [Doc. 10672].  On January 11, 2012, David Ortiz filed a second objection discussing the basis for his objection. [Doc. 10680].  The Defendants are not represented by counsel.  On February 11-12, 2013, the Court held an evidentiary hearing to determine the priority date of the Ortizes' water right.

2.     In making its findings and recommendations on this matter, the Court examined all of the pleadings related to the Ortizes' objection to the proposed priority date for their water right. The Court also considered the testimony and the exhibits admitted at the evidentiary hearing.  After carefully considering the pleadings, testimony, exhibits, arguments by parties and the pertinent law,

---

[1]Within fourteen (14) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the fourteen-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.  See, e.g., Wirsching v. Colorado, 360 F.3d 1191, 1197 (10th Cir. 2004) ("firm waiver" rule followed in Tenth Circuit holds that a party who fails to object to magistrate judge's findings and recommendations in timely manner waives appellate review of both factual and legal questions).

the Court recommends that the Ortizes' objections be overruled and that the Court assign a priority date of 1600 to the Ortizes' water right.

### Background

3.      On December 13, 2011, the Court served the Ortizes with a Notice and Order to Show Cause regarding the priority date for the water rights described in Subfile No. 267 in Section 1 of the Rio Chama Stream System for Tract 22.17.  [Doc. 10669].  The Notice and Order to Show cause stated that a court-appointed historian had studied the history of the settlement of this area and proposed a priority date of 1600.  The Notice and Order to Show Cause also stated that if the Ortizes object to the proposed priority date of 1600 and want to offer proof of an earlier date, they must file an objection with the Court.

4.      The Ortizes timely filed objections to the proposed priority date of 1600.  [Docs. 10672 and 10680].  The Ortizes divert water from the *Acequia de Chamita* and contend that the priority date for their water right should be August 11, 1598, which, according to the Ortizes, is the construction date of the *Acequia de Chamita*.

5.      The Ortizes and counsel for the State of New Mexico, Edward G. Newville, filed a Joint Status Report and Provisional Discovery Plan [Doc. 10687] on February 17, 2012, with a discovery completion deadline of July 15, 2012.

6.      On October 11, 2012, the State filed a motion in limine [Doc. 10867] to prohibit opinion testimony by David Ortiz.  The State contended that because Mr. Ortiz is not a qualified expert, he cannot offer opinion testimony on events outside his own perception.  Mr. Ortiz filed a response [Doc. 10870] opposing the State's motion in limine.  In his response, Mr. Ortiz stated that he will not offer his opinion, noted that he does not claim to be an expert, and wrote "Let the evidence speak for me."

The Court entered a Memorandum Opinion and Order [Doc. 10874] granting the State's motion in limine. The Court concluded that because Mr. Ortiz will be testifying as a lay witness and did not personally observe the construction of the *Acequia de Chamita*, he cannot offer his opinion of when the *acequia* was constructed. The Court stated that Mr. Ortiz may offer documentary evidence regarding the construction date of the *acequia*.

7.     The Court held a pretrial conference on October 25, 2012. [Doc. 10871]. The parties subsequently submitted a proposed Pretrial Order which the Court entered on November 21, 2012. [Doc. 10880]. The Pretrial Order states that Defendants have the burden of proving their claims as to the priority date of the water rights appurtenant to Tract 22.17 in Subfile No. 267, and that if Defendants fail to meet or carry their burden of proof, the Court will enter an Order that assigns a priority date of 1600 to these rights.

8.     The Court held an evidentiary hearing on February 11-12, 2013. [Doc. 10900] Mr. Ortiz, *pro se*, represented the Ortizes. Mr. Newville represented the State. The Ortizes called only one witness:  David Ortiz. The State called only one witness:  Dr. John O. Baxter, the court-appointed expert. The Court accepted the tender of Dr. Baxter and certified him as an expert witness.

## Analysis

### A.     Legal Standards

9.     This adjudication is a suit to determine the rights to use water in the Rio Chama stream system. New Mexico state law requires that the Court enter a decree which "shall in every case declare, as to the water right adjudged to each party, the priority, amount, purpose, periods and place of use, and as to water used for irrigation . . . the specific tracts of land to which it shall be appurtenant . . . ." N.M. Stat. Ann. § 72-4-19.

10.     The Court has established procedures for the adjudication of priority dates for surface water rights in the Rio Chama Mainstream Section (Section 1).  [Doc. 3496].  The Court ordered the court-appointed expert witness, John O. Baxter, to submit a report on the history of water use within Section 1, including priority dates for water used by community *acequias*.  The State then serves a Notice and Order to Show Cause on each defendant water right owner and each defendant *acequia* or community ditch setting forth the priority dates as determined by the court-appointed expert witness, or by the State.  Defendants must file an objection if they disagree with the priority date proposed in the Notice and Order to Show Cause and if they want to offer proof of an earlier date. Defendants who object to proposed priority dates have the burden of proving their claims to an earlier priority date.  [Doc. 10880].

11.     Lay witness testimony is governed by Rule 701 of the Federal Rules of Evidence. Rule 701, Opinion Testimony by Lay Witnesses, provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Although Rule 701 allows for opinion testimony by lay witnesses, such opinion testimony is "considered to be a shorthand statement of the facts that the witness observed."  4 Jack B. Weinstein & Margaret A. Berger, WEINSTEIN'S FEDERAL EVIDENCE, § 701.02 (Rev. 2001).  Rule 701 does not allow a lay witness to offer opinion testimony regarding facts or events that the witness did not personally perceive.

12.     Expert witness testimony is governed by Rules 702 and 703 of the Federal Rules of

Evidence.  Rule 702, Testimony by Expert Witnesses, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or
> education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier
> of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 703, Bases of an Expert's Opinion Testimony, provides:

> An expert may base an opinion on facts or data in the case that the expert has been
> made aware of or personally observed. If experts in the particular field would
> reasonably rely on those kinds of facts or data in forming an opinion on the subject,
> they need not be admissible for the opinion to be admitted. But if the facts or data
> would otherwise be inadmissible, the proponent of the opinion may disclose them
> to the jury only if their probative value in helping the jury evaluate the opinion
> substantially outweighs their prejudicial effect.

**B.     Discussion**

13.     The sole issue in this matter is the priority date for the Ortizes' water right, that is,

the date of the first use of water on their property.  The Ortizes contend that their priority date should

be August 11, 1598.  [Doc. 10880].  In support of their contention, the Ortizes state that the Spanish

explorer and colonizer, Juan de Oñate, arrived on July 11, 1598, "at a cluster of Indian Pueblos

called Ohkay Owingeh which they named San Juan," and "[o]n August 11, 1598, Oñate wrote in his

itinerary, 'we began work on the irrigation ditch for the city of our father, Saint Francis.'"  The

Ortizes assert that the irrigation ditch referred to in the Oñate itinerary, was constructed on the west

bank of the Rio Grande, and is one and the same *acequia* currently in use today by the Ortizes.  The

Ortizes' property is located west of the Rio Grande near the location of the Pueblo of San Gabriel.

5

14.     The State agrees that Oñate arrived at the present San Juan Pueblo, now known as Ohkay Owingeh on July 11, 1598, and on August 11, 1598, began work on an *acequia* for a new city to be called "San Francisco de los Españoles."  [Doc. 10880].  The State asserts that the *acequia* constructed by Oñate was located on the east side of the Rio Grande near the present site of San Juan Pueblo, and is not the *Acequia de Chamita*.  The State further asserts that "[s]ometime between the spring of 1598 [sic][2] and the summer of 1600, the Spanish settlers moved across the Rio Grande and established a new settlement at the pueblo of San Gabriel."  "The settlers promptly established an irrigation system constructing an *acequia* that diverted water for irrigation purpose from the Rio Chama."  The State concludes that the tract of land now owned by the Ortizes was first placed under irrigation in 1600 and should have a priority date reflecting that first use.  The State's position is based on the research and opinion of Dr. John O. Baxter.

15.     Dr. Baxter is a historian, has been a consultant regarding water rights for 30 years, and has testified as an expert in several water rights adjudications.  [*See* Resume of John O. Baxter, Ph.D., Ex. 2].  Dr. Baxter testified that he has reviewed all records regarding the settlement at San Juan Pueblo, New Mexico, including both primary and secondary sources.[3]  Primary sources are

---

[2]The reference to "the spring of 1598" appears to be a typographical error in the Pretrial Order submitted by the parties.  Testimony and argument at the trial clearly show that the State asserts that the settlers moved to the west side of the Rio Grande sometime between the spring of 1599 and the summer of 1600.

[3]There are a multitude of primary and secondary sources on which both Plaintiff and Defendants rely; including a journal of the Oñate expedition, called the *Ytinerario*, which provided a first-hand, near real time recordation of many events.  The *Ytinerario*, prepared by a priest who was part of the expedition, began in 1596 and continued through 1599.  A two-volume study by researchers George Hammond and Agapito Rey, on *Don Juan de Oñate, the Colonizer of New Mexico* is a translation of many original historical documents from the archives in Sevilla, Spain.

Ten to 12 items of correspondence prepared by Oñate's scribe in 1599 at San Juan were also considered by the parties.

Scholars Joaquin Pacheco and Francisco Carvinas edited a series of documents relating to the Spanish conquest and explorations in the New World.  [Ex. 18]  These were all reviewed.

those documents that were created at the time of the events under consideration. Secondary sources are useful because they show where primary sources can be found. Dr. Baxter reviewed those sources for evidence of when water was first used at certain locations and testified that those are the kinds of facts and data that experts in his field reasonably rely upon in forming opinions regarding the first use of water at a location.

When opinions of various other experts differed from his opinion, and where the sources did not provide specific references in support of his opinion, Dr. Baxter offered convincing explanations to support his opinion. The Court finds that Dr. Baxter is a qualified expert through his knowledge,

---

Dr. Baxter considered field work notes and other archeological records from Florence Holly Ellis, head of UNM's Department of Archeology relating to excavations at San Gabriel in 1954 and years thereafter.

Both Plaintiff and Defendant relied on a historical document called "Act of Obedience and Vassalage to His Majesty by the Indians of the Pueblo of San Juan Bautista." [Ex. 6]. This is a historical document memorializing the peonage of the indigenous Indians.

Other documents and sources considered included a 1959 Declaration of Water Rights filed with the State Engineer for the Alcalde Ditch, and various change of ownership documents showing a priority date for the *Acequia de Chamita* of 1600. [Ex. 31].

Dr. Baxter considered a 1892 report prepared by W.W. Follet. [Ex. 30].

Also included in the historical documents were letters prepared by Oñate addressed to the Spanish Viceroy, and carried by Gaspar Perez de Villagra, as well as a letter dated May 1599 addressed to Villagra.

Oñate also prepared letters which his nephew, Vicente de Zaldivar, was to deliver to Spanish authorities.

There is a letter from Luis Velasco addressed to the Spanish Viceroy. [Ex. 26].

Of importance, is an epic poem written by Villagra, which was published in Spain in 1610, "The History of New Mexico." [Ex. 15]. The poem describes the expedition and the early days of the colony.

Dr. Baxter considered Hubert Bancroft's *History of Arizona and New Mexico*, published in 1889, as well as reports from historian Adolph Bandelier, published in 1892 [Ex. 9], and a massive report by Torquemada, a Franciscan who published *Monarchia Indiana* in 1615.

So, too, works by historians Ralph Twitchell, *The Leading Facts of New Mexico History*; [Ex. 13] published in 1911; and Benjamin Reed's 1912 *History of New Mexico* were consulted. Dr. Herbert Bolton's *Spanish Exploration in the Southwest*, published in 1916, was also a source.

New Mexico writer Marc Simmons authored a biography of Oñate, *The Last Conquistador: Juan de Oñate and the Settling of the Far Southwest* [Ex. 22], published in 1991. His work was reviewed and considered by both Dr. Baxter and the Ortizes.

The parties considered a chapter in a book authored by State Historian, Dr. Myra Jenkins in 1987.

Dr. Baxter also reviewed plats of tracts of land made by the State Engineer Hydrographic Survey, which show tracts of land irrigated by the *Acequia de Chamita*.

experience and training, that his testimony is the product of reliable principles and methods, and that he has reliably applied the principles and methods to the facts of the case.  When the Court asked Mr. Ortiz if he had any objections to Dr. Baxter testifying as an expert witness, Mr. Ortiz responded: "No."

16.     In 1540, the Spanish Conquistador Francisco Vázquez de Coronado, led an expedition into the northernmost regions of *Nuevo España*, an area which would later be called *Nuevo Mexico*.  Coronado's quest was to find the fabled Seven Cities of Cibola, the purported ancient cities believed to be constructed of gold and precious metals.  Instead of finding riches and precious metals, Coronado discovered the richness of the Native American inhabitants, the pueblo Indians, who occupied a number of communities in the area.

17.     Coronado learned that the Seven Cities were a fable, but continued with a quest for gold by searching for another fabled city, Gran Quivira, an area beyond the grassy plains in current day Kansas.

18.     A second unauthorized Spanish expedition occurred in 1593, led by Francisco Leyva de Bonilla and Antonio Gutierrez de Humaña.  They, too, sought the riches of Quivira and, after spending a year with the pueblo Indians, explored the great plains.  That expedition also failed and the explorers met with death during the journey.

19.     Juan de Oñate, the son of one of Coronado's conquistadores, Cristobal de Oñate, distinguished himself in military campaigns against the Chichimec Indians.  He also participated in the establishment of a Spanish colony, which would later be renamed San Luis Potosi.  Due to the discovery of rich silver mines, that area quickly grew in size and importance, and Oñate's leadership efforts were rewarded by being named the first *alcalde* of San Luis Potosi.  Oñate's success in the establishment of this colony fueled his ambition to engage in other major expeditions.

8

20.     In 1595, King Phillip II of Spain designated Oñate to lead a new expedition into the same area previously traveled by Coronado, and to establish a colony at the outer edges of the northern frontier in *Nuevo Hispaña*. The purpose of the expedition was not only to search for precious metals, but, more importantly, to spread Catholicism to this new area, baptize the Indian population, and establish mission churches.

21.     Author Herbert Bolton, in his book *Spanish Exploration in the Southwest, 1542 - 1706*, notes that the Oñate expedition consisted of 400 soldiers, settlers and their families, together with 83 carts and wagons, and nearly 7,000 head of livestock.

22.     One of the priests who accompanied Oñate had the responsibility of maintaining the journal. That journal, called the *Ytinerario*  [Ex. 8 and Ex. 19, which is a translation of Ex. 8] or itinerary, provides a contemporaneous real-time account of the Oñate expedition.

23.     When the expedition, which had traveled from the Spanish capital to present day El Paso, crossed the Rio Grande River on April 30, 1596, Oñate took possession and declared ownership of "the kingdoms and provinces of New Mexico for King Phillip II of Spain."

24.     Oñate's expedition continued along what would later be called the "Jornada del Muerto," or the Journey of Death, a 100-mile expanse of desert with few, if any, water sources. The expedition successfully completed the trek through the desert and through present day Socorro, New Mexico. The expedition continued with its northern trek, encountering many Indian pueblos, and, ultimately, arriving at the Pueblo of Caypa, an area northwest of current day Española, New Mexico.

25.     The *Ytinerario* not only indicates the days of the month during which the expedition proceeded, but the right-hand side of the page indicates the distance traveled each day in terms of leagues. On the second page of Exhibit 8, there is an entry that reads, "On the 11th, we traveled two leagues to the Pueblo of Caypa, which we called San Juan." This is the location of Oñate's

encampment and where he established the seat of Spanish government in *Nuevo Mexico* in 1599. There was an existing pueblo with hundreds of Tewa Indians. Oñate took possession of the pueblo for his soldiers, settlers and families, and bestowed on the pueblo a new name, San Juan, in honor of St. John the Baptist.

26.     Dr. Baxter testified that this reference in the *Ytinerario* is the first recorded use of the name San Juan for the New Mexico colony. The Pueblo of Caypa was inhabited by Tewa Indians.

27.     Dr. Baxter noted an entry in the *Ytinerario* that construction on the *acequia* began on August 11, 1598, and it was located on the east side of the Rio Grande. Some 1,500 pueblo Indians were pressed into service to dig the *acequia*.

28.     Dr. Baxter based his opinion on the location of the *acequia* on his review of the *Ytinerario*. The *Ytinerario* states that Oñate went to "San Juan" on August 10, 1598, and "[o]n the 11th we began work on the irrigation ditch for the city of our father, Saint Francis."

29.     Oñate had great hopes of establishing a city that would be far more important and successful than San Luis Potosi. He envisioned the creation of a city named for St. Francis, City of Our Father, San Francisco. [Ex. 8, at 4]. It would be at the top of the Spanish hierarchy for communities. The creation of such a city, at Oñate's urging, would bring him great fame, and he hoped he could parlay the success of the construction of San Francisco into being in the direct chain of command, bypassing the Viceroy and reporting directly to the King of Spain. The digging of the *acequia* was the first step in providing water to the proposed San Francisco.

30.     Dr. Baxter testified that there are two references to the City of San Francisco in the *Ytinerario* and the "Act of Obedience." There is a possible indirect reference to the City of San Francisco. In 1601, a member of one of the expeditions, after returning to New Spain, testified during a preliminary investigation of Oñate's colony that Oñate wanted to build a major city, but

the colonists refused to participate and the city was not built.

31.     Dr. Baxter testified that "San Juan," where the *acequia* was built, refers to the Pueblo of San Juan located on the east side of the Rio Grande.  Dr. Baxter opined that while the exact location of the intended City of Saint Francis is uncertain, it most likely was on the east side of the Rio Grande where it would not encroach on Indian farmland, based on stipulations in Oñate's contract and in ordinances regarding colonization.  Dr. Baxter testified that there was a large area on the east side of the Rio Grande suitable for urban development whereas there were farmlands on the west side.  He also testified that the purpose of an *acequia* on the east side of the Rio Grande was for irrigation but, more importantly, to serve the proposed urban entity.

32.     The City of San Francisco was not built.  The reasons are unclear, but in testimony given by Gines de Herrera Horta in 1601, he says that the governor [Oñate] wanted a town established, an *alcalde* named, and houses built, but that the Spaniards refused.  Herrera Horta thought the reason for this was their dissatisfaction with remaining in the colony and their desire to abandon the area because of the great privations they were suffering.

Regardless of the reasons the Spaniards refused to construct the city, Oñate's dream of the establishment of the City of San Francisco crumbled, as did his hopes for fame and fortune, as the city was never built.  Dr. Baxter believes that the approximate site of the proposed City of San Francisco was close to the Pueblo of San Juan on the east side of the Rio Grande.

33.     Dr. Baxter described letters and other information prepared in the first two months of 1599 that Oñate was preparing to send a delegation to Mexico City with information for the Viceroy, and then, ultimately, for the King, that would document Oñate's accomplishments.  He intended to plea for more men, provisions and additional assistance.

34.     Prior to the departure of the delegation, Oñate had his scribe copy a number of

reports of various important achievements, including assays of discovery of mines, and conversion of Indians to Christianity, or at least to obedience to the King.  There were ten or twelve separate documents prepared in January and February of 1599, all prepared, as indicated on the documents, at San Juan de Bautista.  None of the documents indicate that they were prepared at any location other than San Juan de Bautista, and none of those documents refer to the Pueblo of San Gabriel.

35.     The personal letters written by Oñate dated March and April 1599 addressed to the Viceroy sought support for colonists, reinforcements, and other supplies.  All of these documents were taken to the Viceroy from a delegation from the colony.

36.     The delegation to the Viceroy was led by Gaspar Pérez de Villagrá.  There was also a final letter written by Oñate in 1599 addressed to Villagrá, and it carries it place of origination "from the capital."  It is dated May 1599.

37.     The Villagrá delegation left in March 1599.  The relief expedition ultimately returned to the new colony a year and one-half later before Christmas 1600.  By the time it returned, the colony's headquarters was no longer located at San Juan; , but it had been moved to an adjoining pueblo located at San Gabriel.  Thus, when the relief expedition arrived that Christmas Eve, San Gabriel was the capital.

38.     Oñate's nephew, Vicente de Zaldivar, led a smaller expedition to the buffalo plains.  On their journey, they explored other Indian areas, including Abo, Acoma, Uni and Hopi territory.

39.     Oñate, himself, led explorations to Pecos and into the great plains.  Mixed reports on the colony's success were dispatched to the Viceroy, with some reports of great success sent by Oñate's supporters, and others of great deprivation and want sent by his detractors.  While on these expeditions, there was some dissension in the San Juan colony, and a large number of colonists fled, seeking to return to the southern territory.

12

40.     Dr. Baxter testified that the Pueblo of San Gabriel was located directly west and across the Rio Grande from the Pueblo of San Juan.  He also stated that San Juan and San Gabriel are two separate and distinct pueblos based on a statement in the Act of Obedience.  The pueblos, given Spanish names by Oñate, were two different pueblos, although in close proximity to one another.  During the 1601 inquiry by Valvarde, the witness Marcelo de Espinosa describes two pueblos separated by the river.  [Ex. A, at 639].

41.     The Act of Obedience describes the assignment of Franciscan Friars to the various Indian Pueblos on September 9, 1598.  The Act of Obedience identifies the pueblos that Father Cristóbal de Salazar was assigned to and listed "this pueblo of San Juan Bautista" separately from "San Gabriel."  [Ex. 5].  Dr. Baxter testified that "San Juan Bautista" refers to the Pueblo of San Juan, based on language in the *Ytinerario*.  By separate references, and separate names, it is clear that neither Oñate nor the colonists considered these two pueblos to be one and the same.

42.     The reason for the move from San Juan to San Gabriel is unclear and no explanation appears in the *Ytinerario*.  Dr. Baxter stated that there are no documents after February 1599 that reference being prepared in San Juan.  Documents prepared by Oñate's nephew Zaldivar were dated at San Gabriel in July 1600 and are the earliest known documents that indicate the occupation of San Gabriel by the Spanish colonists.  Based on his review of the historical documents, Dr. Baxter concluded that Oñate and the Spanish colony were located at San Juan Pueblo on the east side of the Rio Grande beginning in July and August 1598 until February 1599, and that sometime between the spring of 1599 and July of 1600, the colony relocated to the west side of the Rio Grande at the Pueblo of San Gabriel.  Dr. Baxter testified that the settlers would have constructed another *acequia* in San Gabriel shortly after relocating the colony there.

43.     It is the occupation of San Gabriel in the summer of 1600 which forms the basis of the State's recognition of a priority date of 1600 for the Ortiz water rights.

44.     When asked if there were any historical documents that indicate when colonists occupied the Pueblo of San Gabriel prior to the arrival of reinforcements before Christmas 1600, Dr. Baxter said there were letters and reports dated in San Gabriel prior to that time.  [Exhibit 24]

45.     During the summer of 1601, Oñate led a major expedition out onto the plains, extending as far as present day Kansas.  When he returned from this expedition in November of 1601, he discovered that a large number of colonists had deserted the colony and left New Mexico.

46.     Oñate sent his nephew, Vicente de Zaldivar, with an expedition to try to overtake the colonists, arrest them, and punish them.  That effort, however, was not successful because the fleeing colonists had too great of a head start.  They made their way into *Nuevo Vizcaya*, where Oñate didn't have jurisdiction.

47.     State's Exhibit 26 is a letter authored by Capt. Luis Velasco delivered to the Viceroy. In it, he asserts that food at the colony is in very short supply and that the colonists were increasingly dependent upon the Pueblo's short stores.  They were taking the Pueblo's food by force and extortion, and this was causing significant problems.

48.     In 1598, a skirmish occurred when Oñate's troops sought supplies from the Acoma Indians.  The supplies the Acomas refused to provide were necessary for the Acomas own winter needs.  A fight ensued and twelve of Oñate's men were killed, along with his other nephew, Juan de Zaldivar.  In 1599, Oñate retaliated, killing many Indians and maiming more than 80 Acoma males.

49.     Reports of Oñate's harsh dealings with the pueblo Indians and colonists were conveyed to the Viceroy.  In the interim, Oñate was away for five months exploring the buffalo

plains and seeking, as Coronado had, the fortunes of Gran Quivira.  On his return to San Juan, he found the colony in upheaval.  Many colonists had fled; others were suffering great deprivation.  Some colonists remained loyal, others did not.  Oñate struggled to regain his authority as the colony's Governor.

50.     Ultimately, Oñate was recalled to the capital by the Viceroy.  The recall was based on allegations of harsh treatment of the indigenous Indians and of the colonists.  In 1606, Oñate was drawing plans to move the governmental headquarters to a new location.  He resigned the governorship in 1607 and returned to Mexico City.  There, he was tried for offenses against the crown due to his conduct.  He was convicted of cruelty to natives and colonists, but cleared of all charges on appeal.

Oñate would return to Spain as a minor governmental functionary, but never returned to New Mexico.  Afer he resigned the governorship, the new Governor of New Mexico moved the capital to Santa Fe in 1610.

51.     Based on his review of the history, original and secondary sources, maps and public records, Dr. Baxter believes that the lands irrigated by *the Acequia de Chamita* were first irrigated in 1600.  The basis of his opinion is that it was during that period that the colony was moved from the east bank, San Juan, to the west bank, San Gabriel, and with the move, it was necessary to create irrigation.  He believes that move and creation of the ditch occurred between March of 1599 and July 1600.

52.     Dr. Baxter stated that the original documents, specifically the *Ytinerario* and the "Act of Obedience," and, subsequently, the documents that were created in 1599 prior to the expedition to Mexico City, fully support his opinion.  He acknowledges, however, that other historians, archeologists and writers conclude that the first settlement and seat of government was San Gabriel.

15

53.     Dr. Baxter also referred to an epic poem written by Gaspar Pérez de Villagrá, an officer of Oñate's expedition who accompanied Oñate to San Juan in 1598.  In 1599, Villagrá was named to head the expedition that went back to New Spain, but when it was time to return with the relief expedition, Villagrá had a falling out with authorities in New Spain and never returned to New Mexico.  He returned to Spain, and, while there, wrote the poem, which is considered a masterpiece of its kind.  He called it "The History of New Mexico," and was first published in 1610.  This poem is contained in Exhibit 15, in both the original Spanish and English translations.

54.     In this epic poem, Villagrá describes the colonists' arrival at San Juan and the location of the colony.  On the first page of the Exhibit, on the English side, lines 10-12, it states, "Happy and in great pleasure did arrive at a fine pueblo, well laid out, to which they gave the title of San Juan."

55.     Further, in referring to the location of the colony, Villagrá's states in Exhibit 15:

> That had in so long time occurred to us
> and as the royal ensign, Peñalosa
> arrived with all the camp without mishap
> at the town of San Juan, the holy men
> then made a church, and it was blessed by the father commissary.

56.     On page 160, lines 172-174 of Exhibit 15 the poem states, "There being those there in San Juan who did not sleep, the general and the commissary together upon the part of the most holy church."  So, too, on page 181, line 274, Villagrá states, "I wish to return to San Juan, the capital." This historical writing supports Dr. Baxter's conclusion that the first settlement was located at San Juan, the first capital of *Nuevo Mexico*.  Villagra's wish to return to San Juan was never fulfilled.  He never returned to the colony.

57.     Dr. Baxter concedes that other historic writers do not agree that the location of the capital was San Juan.  Some believe it was San Gabriel.  For example, Hubert Bancroft, a publisher

and document collector in San Francisco, had great interest in all aspects of western American history.  He compiled a series of writings, some 32 volumes, that cover the history from New Mexico to Alaska.

58.     Exhibit 4 is part of Hubert Bancroft's volume entitled, *History of Arizona and New Mexico*, published in 1889.  The materials available to Bancroft at the time of publication included the printed version of the documents compiled by Pacheco and Cardenas in Spain, as well as the *Ytinerario* and the "Act of Obedience," and other papers as well.

59.     Bancroft described details of the Oñate expedition by stating that the expedition came to New Mexico and established the capital at San Juan, where a church was built.  Bancroft made no mention of San Gabriel.

60.     Dr. Baxter agrees with Bancroft, but criticizes Bancroft for failing to mention San Gabriel or indicate where it was located.

61.     Historian Adolph Bandelier, for whom Bandelier National Monument is named, was not only a scholar, but he is considered the father of southwestern archeology.  He had great interest in the Southwest and in the culture of New Mexico Indians.  He is known primarily for his work in archeology and anthropology.

62.     A report from Bandelier was published in 1892, Exhibit 9, after exhaustive investigation.  Bandelier traveled all over New Mexico learning about the situation relating to Native Americans.  He traveled in the Chamita area, which he inspected prior to the publication of his report in 1892.

63.     Bandelier believed that the first settlement was at San Gabriel rather than at San Juan. In reaching his conclusion, Bandelier relied on Fray Juan de Torquemada, who was an important figure in the Franciscan order based in Guadalajara, and was commissioned by his superiors to write

17

a massive tome known as the *Monarchia Indiana*, which covers a wide range of Spanish exploration and contact with native peoples. Torquemada did not participate in the Oñate expedition, but concluded that the site of the first settlement was San Gabriel. Bandelier had the same materials available to him that Bancroft reviewed, but he came to a different conclusion.

64.     Torquemada's report was published in 1615, and while Bandelier relied on this report for his opinion that San Gabriel was the original settlement, Bandelier does not give any argument for his statement. Bandelier's conclusion finds support in a July 1601 inquiry conducted at the behest of the Viceroy by Valverde, who recorded witness statements some years after Oñate's arrival. One witness, Brondate, who had been part of the Oñate expedition, stated that after a march up the Del Norte River, Governor Oñate took possession. He said the camp was established at San Gabriel. [Ex. A, at 625].

65.     The witness, Brondate, described the pueblo Indians as peaceful, docile and having a "gentle nature." Another witness in the same 1601 inquiry, Marcelo de Espinosa, who had been with Oñate since 1595, described the Indians as farmers who grew maize, cotton, beans, calabazas and melons. Some of their fields were irrigated and others depended upon seasonal rain. These witnesses identify San Gabriel as the location of the settlement.

66.     Ralph Twitchell, a Santa Fe attorney and historian, published works on the history of New Mexico and the Oñate expedition. His two-volume set *The Leading Facts of New Mexico History* includes an account of Oñate's settlement. State Exhibit 13 is a portion of Twitchell's first volume published in 1911. Twitchell accepted Bandelier's view that San Gabriel was the location of the first settlement upon Oñate's arrival in *Nuevo Mexico*.

67.     Dr. Baxter referred to *Illustrated History of New Mexico* by Benjamin M. Read, an attorney with a great interest in New Mexico history, which was published in 1912. Read agreed

18

with Bancroft on the location of Oñate's first settlement and disputed Twitchell's interpretation which was based on Bandelier's opinion that the first settlement was at San Gabriel. Torquemada's statement was that the colony was located between two rivers, Read said that the two rivers were the Rio Grande and the Rio Santa Cruz, with which Dr. Baxter disagrees.

68.     Dr. Baxter also referred to another academic historian Herbert Bolton. Dr. Bolton was with the University of Texas, and then moved to the University of California. His book, *Spanish Exploration in the Southwest*, was published in 1916. In it, Dr. Bolton gives a brief summary of Oñate's colonization, agreeing that Oñate first arrived in San Juan. He later suggests that they moved across the river to San Gabriel.

69.     He encouraged one of his students, George Hammond, to continue the investigation to see if he could review original documents in Spain. Hammond undertook research in Sevilla and spent a year studying the Spanish archives. Upon completion of his research, he wrote a dissertation which was published, and then also reproduced serially, in the New Mexico Historical Record.

70.     Hammond believed that the colonists first settled at San Juan and then moved across the river to San Gabriel. The basis for his opinion is contained in the *Ytinerario* and the "Act of Obedience," along with the other documents relied upon by Dr. Baxter in this case. Hammond also recognized that many of the documents dated in early 1599 stated they were prepared in San Juan or San Juan de Bautista.[4]

71.     Another well-known New Mexico writer, Marc Simmons, wrote a biography of Juan de Oñate. [*See* State's Exhibit 22]. Simmon's biography entitled *The Last Conquistador: Juan de Oñate, and the Settling of the Far Southwest*, was published in 1991. Simmons opined that the

---

[4]Dr. Baxter stated that the documents use San Juan and San Juan de Bautista interchangeably.

colonists first settled at San Juan and, subsequently, moved the capital to San Gabriel. [*See* Exhibit 22].

72.     Dr. Baxter referred to a chapter by Myra Ellen Jenkins, a former state historian for the State of New Mexico, published in 1987. [Ex. 25]. Dr. Jenkins believed that Oñate first settled at San Gabriel. Dr. Baxter did not think that Dr. Jenkins considered the entire historical record.

73.     Dr. Baxter testified about the work conducted by archeologist Florence Ellis, who oversaw an extensive archeological dig at San Gabriel in 1959 through 1962. Referring to Exhibit 32, representing another chapter from the same book cited for Dr. Jenkins, archeologist Ellis agrees that the colony was relocated from the Pueblo of San Juan to the Pueblo of San Gabriel.

74.     Archeologist Ellis made statements about which pueblo was established first, and the relative ages of the pueblos based on the archeological record. Her research indicated that the Pueblo of San Juan was the older of the pueblos and was established first. Archeologist Ellis agreed that Oñate's colony relocated from the Pueblo of San Juan to the Pueblo of San Gabriel.

75.     After he read portions of many exhibits, Mr. Ortiz moved his exhibits into evidence. Counsel for the State had no objections. The Court admitted all the exhibits tendered by Mr. Ortiz except for Exhibit TT, which was not a historical document but, instead, was a pleading from another water rights adjudication. [Exhibits A-C, E-H, J-S, U-W, NN]. The Court read the portions of the exhibits as Mr. Ortiz was reading aloud from those exhibits. The Court reread those portions of the exhibits after the trial.

76.     Mr. Ortiz read testimony of several persons who were part of a formal inquiry about the expedition conducted in July 1601. Those persons, identified as Brondate, Marcelo de Espinosa, Gines de Herrera Horta, and Juan de Ortega, testified that San Gabriel "is the place where their camp was established" and was the "headquarters of the governor." [Exhibits A, B]. However, those

testimonies were given at San Gabriel in 1601 which, according to Dr. Baxter, is after the date the settlers moved their colony from San Juan, east of the Rio Grande, to San Gabriel, west of the Rio Grande.  Those testimonies conflict with the *Ytinerario*, the Act of Obedience and numerous other historical documents.

77.     Mr. Ortiz also read from the "Report of the People Who Remained in New Mexico, 1601."  [Ex. C].  The Report was prepared in San Gabriel in October 1601 and contains statements by witnesses regarding plantings and harvests in response to the Fourteenth Interrogatory which asks the witnesses: "if he knows that in the three years we have been here we have planted wheat and vegetables and that both the planting and harvests have increased."   The witnesses' responses indicated that the harvest increased each year.  Mr. Ortiz argues that three years of harvests ending in 1601 indicates that the first harvest occurred in 1599, thus supporting his contention that work on the *acequia* at San Gabriel began in 1598.  The Report does not indicate that the use of "here" in the Fourteenth Interrogatory refers specifically to San Gabriel exclusively.  The general context of the Report suggests that "here" refers to the San Juan/San Gabriel area, where these two separate pueblos were located.

78.     Mr. Ortiz read excerpts from the *Ytinerario* which state Oñate traveled to the "Valle de San Juan" and the "San Juan valley" in July and September, 1598.  [Exhibits K].  He also read excerpts from the Act of Obedience which refer to the "valley of San Juan Bautista" and the Pueblos of San Juan Bautista and San Gabriel.  [Exhibit L].  Although San Gabriel may be in the area generally referred to as the San Juan valley, those statements in the *Ytinerario* and the Act of Obedience do not show that Oñate first arrived at San Gabriel in 1598.  Other statements in the *Ytinerario* state that Oñate arrived first at San Juan Pueblo in 1598.

79. Another document offered by Mr. Ortiz shows that Oñate and the Spanish colonists were at San Gabriel in 1600 or later. [Ex. S]. That same document also states that San Juan "was the first town established," and San Juan was "their first post." Statements showing Oñate and the Spanish colonist were at San Gabriel in 1600 and later, without more, are not evidence of water use at San Gabriel in 1598.

80. Mr. Ortiz read an excerpt from a translation, by David Ortiz & Velasquez, of Torquemada, Libro Quinto, cap. XXXVII & XXXX. [Exhibit NN]. The excerpt states Oñate made his settlement between two rivers and named it San Gabriel. The excerpt is not persuasive for two reasons. First, the excerpt does not state the date Oñate settled at San Gabriel. Second, Dr. Baxter testified that Torquemada's document, published in 1615, is not a primary source and that it is difficult to determine what Torquemada's sources of information were.

81. It is clear that a legitimate conflict exists concerning the first location of Oñate's encampment and seat of government. The preponderance of evidence, however, favors a determination that the settlement was first in San Juan, and not San Gabriel.

82. The Court recognizes that the actual first use of water in a particular *acequia* may have occurred prior to such use being memorialized in an historical document. However, the Ortizes have the burden of proving their requested priority date. [Doc. 10880]; *see also* 32A C.J.S. *Evidence* § 1310.b. (2002) (where evidence on an issue of fact is evenly balanced, the party having the burden of proof fails on that issue); <u>Kosakow v. New Rochelle Radiology Associates</u>, 274 F.3d 706, 731 (2d Cir. 2001) (same).

83. The Ortizes irrigate their land from the *Acequia de Chamita*. The point of diversion is on the north side of the Rio Chama. No clear or convincing evidence demonstrates that this was the ditch constructed by the Indians and colonists in 1598. The Ortizes have not offered clear and

convincing evidence that demonstrates water use on their property or via the *Acequia de Chamita* started in August 11, 1598, and therefore, have not met their burden of proof. The Court will not speculate or guess at possible dates earlier than those proposed by the State. *See* <u>Daniels v. Twin Oaks Nursing Home</u>, 692, F.2d 1321, 1324 (11th Cir. 1982) (inference is not reasonable if it is only a guess or a possibility); <u>Andrus v. Gas Co. Of New Mexico</u>, 798 P.2d 194, 197 (N.M. App. 1990) (evidence which supports two inferences equally supports neither). Instead, the Court will recommend that the priority date for the Ortizes' water right be 1600 as supported by the State's evidence.

84.     In addition to the foregoing findings, and to the extent they are not inconsistent, the Court adopts the State's proposed findings. [Doc. 10892].

85.     In addition to the foregoing findings, and to the extent they are not inconsistent, the Court adopts Defendant Ortizes' proposed findings 1-13, 21-29, 31-39, and 55.

## Recommended Disposition

That the Ortizes' objections to the proposed priority date of 1600 are overruled.

That the priority date for the water rights described in Subfile No. 267 in Section 1 of the Rio Chama Stream System for Tract 22.17 is 1600.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
United States Magistrate Judge